Kathryn MANNING et al.

v.

Peter J. BELLAFIORE, M.D.

No. 2005–320–Appeal.

Supreme Court of Rhode Island.

April 12, 2010.

Michael T. Eskey, Esq., Providence, for Plaintiff.

Joshua E. Carlin, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., FLAHERTY, and ROBINSON, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The defendant, Peter J. Bellafiore, M.D., appeals from a Superior Court order granting the motion for a new trial sought by the plaintiff, Kathryn Manning.[1] This wrongful death and medical malpractice action arises out of the tragic and premature death of Michael Manning. After a lengthy trial, a jury found in favor of Dr. Bellafiore. The trial justice granted the plaintiff's motion for a new trial, both as a sanction for what he considered Dr. Bellafiore's "flagrant discovery abuse[s]" and because he found the jury's verdict to be against the fair preponderance of the evidence. For the reasons set forth in this opinion, we affirm the order of the Superior Court.

## I

### Facts and Travel[2]

On March 4, 1998, Kathryn Manning's husband fell in his bathroom after losing consciousness. At the time, Mr. Manning was forty years old and the father of four young children. When his wife found him, Mr. Manning was unable to sit up or open his eyes, and he had a mild facial droop on his right side. He was taken to South County Hospital where he was treated by emergency-room personnel. An initial computerized tomography (CT) scan revealed normal blood flow. Doctor Bellafiore, a neurologist who was on call at South County Hospital, examined Mr. Manning several hours after his admission to the emergency room. By that time, Mr. Manning's condition had improved somewhat, and Dr. Bellafiore contacted Donald McNiece, M.D., Mr. Manning's primary-care physician, to obtain his medical history. Although Dr. McNiece was Mr. Manning's admitting physician, he deferred to

---

1. Mrs. Manning brought suit individually and in her capacity as administratrix of the estate of Michael Manning, and on behalf of her four minor children.

2. Our review of the record indicates that the various expert witnesses may have used different medical terminology to describe the same or similar clinical procedures. Our recitation of the facts attempts to relate as accurately as possible those facts pertinent to this appeal. We recognize, however, that in so doing we may have used medical terminology inartfully.

Dr. Bellafiore in providing Mr. Manning's treatment.

Doctor Bellafiore established a differential diagnosis for Mr. Manning, which is essentially a list of considered causes of a given symptom or symptoms. Among the sources of Mr. Manning's symptoms contemplated by this differential diagnosis were complex migraine, aneurysm, tumor, and stroke. Doctor Bellafiore recommended that Mr. Manning undergo a magnetic resonance imaging (MRI)/magnetic resonance angiography (MRA) of the circle of Willis[3] to determine whether Mr. Manning was suffering a stroke and, if so, to locate the blockage of blood flow to the brain.[4] Doctor Bellafiore also prescribed aspirin as an antiplatelet medication.

Mr. Manning first attempted to undergo an MRI/MRA the day he was admitted to South County Hospital. Unfortunately, he had a claustrophobic reaction and became nauseous while inside the closed MRI/MRA machine, and he was unable to complete the test. Doctor Bellafiore prescribed the antianxiety medication Ativan and the antinausea medication Compazine for Mr. Manning, but his second attempt to undergo an MRI/MRA later that same day also was unsuccessful. In the hope of mitigating Mr. Manning's claustrophobia, Dr. Bellafiore attempted to arrange a so-called "open architecture MRI" for Mr. Manning to undergo at Rhode Island Hospital. Doctor Bellafiore's efforts were frustrated because the MRI machine was being repaired. The radiologist at Rhode Island Hospital initially believed those repairs would be completed by the afternoon of March 5, 1998, but when he called back, Dr. Bellafiore learned that the open MRI machine would be down for repairs indefinitely.

At 3 a.m. on March 6, 1998, Mr. Manning began complaining about a severe headache. He also began experiencing a visual impairment resembling a "white veil." Doctor Bellafiore ordered a second CT scan to determine whether the loss of vision could be attributed to swelling in the brain, and the test results indicated "a new prominent segmental abnormality in the left occipital lobe[.]" This confirmed that Mr. Manning had suffered a stroke two days earlier, but the test did not show any increased cranial pressure.[5]

At approximately 9 a.m. on March 7, 1998, Mr. Manning suffered a second, catastrophic stroke. Mr. Manning was airlifted to Massachusetts General Hospital (MGH), where he was immediately treated by Christopher Putman, M.D. After examining the results of an advanced CT scan,[6] Mr. Manning's treatment team de-

---

**3.** The circle of Willis is "a roughly circular anastomosis that is located at the base of the brain and formed by the anterior communicating artery, the two anterior cerebral, the two internal carotid, the two posterior communicating, and the two posterior cerebral arteries." The American Heritage Medical Dictionary 158 (2007).

**4.** Both magnetic resonance imaging (MRI) and magnetic resonance angiography (MRA) use magnetic fields and radio frequency waves to visualize anatomic structures. Stedman's Medical Dictionary B13 (28th ed. 2006). An MRA simply uses special magnetic resonance sequences "that enhance the signal of flowing blood and suppress that from other tissues." Stedman's Medical Dictionary 86 (28th ed. 2006). According to Dr. McNiece, both an MRI and an MRA are noninvasive tests, the difference being "just the way the magnets spin."

**5.** Doctor Bellafiore conceded at trial that had he ordered a CT scan a day earlier on March 5, it would have revealed the same information.

**6.** In 1998, MGH had an advanced angiographic CT scan that allowed for imaging of the blood vessels in the head and neck by injecting radiographic dye into the veins.

termined that he had likely suffered a stroke caused by a blockage in the basilar artery in his brain. Doctor Putman performed an angiogram and discovered that Mr. Manning's left vertebral artery was almost completely blocked. He then used several microcatheter treatment balloons to partially expand the artery. Upon reaching the basilar artery, Dr. Putman discovered a clot, which he identified as the cause of the stroke. Doctor Putman attempted to break apart the clot using the clot-buster Urokinase; and, after that was only minimally effective, he inflated several balloons, which dislodged the clot. The clot traveled into another portion of Mr. Manning's brain, and Dr. Putman determined that the risks of further treatment in this region were too great. Unfortunately, Mr. Manning steadily lost brain function and on March 9, 1998, life support was withdrawn and he died.

Mrs. Manning filed a civil action against Drs. Bellafiore and McNiece, as well as South County Hospital, alleging negligence and wrongful death. After extensive discovery, trial began on January 4, 2004. At trial, plaintiff contended that the standard of care required Mr. Manning's physicians to conduct an MRI/MRA examination within twenty-four hours of his first stroke. According to plaintiff, Dr. Bellafiore breached this standard of care by failing to accomplish the MRI/MRA examination promptly, and by failing to apprise Mr. Manning of alternative means to accomplish imaging, such as adequate sedation, after it became clear that Mr. Manning's claustrophobia would otherwise pre-

vent him from completing the test in a closed MRI/MRA machine. Moreover, plaintiff contended that if Dr. Bellafiore was unable to complete the MRI/MRA examination at South County Hospital, Mr. Manning should have been transferred to a tertiary care hospital[7] that performed conventional cerebral angiograms. Additionally, plaintiff argued that Dr. Bellafiore breached the standard of care by failing to administer the clot-buster Heparin after Mr. Manning was admitted.

A great deal of the testimony elicited at trial pertained to Dr. Bellafiore's unsuccessful efforts to obtain an MRI/MRA test for Mr. Manning.[8] Doctor Bellafiore acknowledged that an MRI was an important diagnostic tool for ruling out possible causes of Mr. Manning's symptoms, as well as for determining whether there was any damage to his brain tissue, which is an indication of an interruption of blood flow. Moreover, an MRA could pinpoint where in the arteries the damage had occurred, which is crucial for determining the cause of a stroke.

Doctor Bellafiore testified that he was involved in the initial efforts to obtain a closed MRI/MRA on March 4, 1998, through the Rhode Island Medical Resonance Imaging Network.[9] He testified that after Mr. Manning could not overcome his claustrophobia, he presented Mr. Manning with two options to accomplish the closed MRI/MRA several times on both March 5 and March 6. First, he stated that he offered Mr. Manning additional Ativan "to make him a little sleepier to see if he could tolerate the test." Addi-

---

7. Although the litigants never defined "tertiary care hospital," this term generally refers to a major hospital that offers a full spectrum of medical services.

8. We restrict our recitation of the facts to those relevant to plaintiff's claims against the sole appellant, Dr. Bellafiore.

9. South County Hospital was a participant in the Rhode Island Medical Resonance Imaging Network, which provided hospitals without in-house MRI/MRA machines the use of its portable MRI/MRA machine on certain scheduled days.

tionally, Dr. Bellafiore testified that he offered his patient intravenous conscious sedation, which achieves a significantly deeper level of sedation.[10] He explained that Mr. Manning could accomplish the MRI/MRA examination by general anesthesia, but he testified that he did not present this option because he felt that the risks outweighed the benefits.[11] Doctor Bellafiore vividly described Mr. Manning's refusal of these options stating,

"What he said to me—and I remember it, because I was struck by it. He told me, 'I'm sorry, Doc.' I remember it when people call me Doc. It just makes me feel like a doctor. 'I know you need me to do this test to figure out what to do, but I just can't do it.' This was on the morning of the 5th after I told him all the things that could be possibly wrong. And I told him about conscious sedation. I told him about Ativan. I told him the open MRI may not give us the answer we need. I basically held— and told him he could have a stroke, he could have a tumor. I was holding a neurological gun to his head."

According to Dr. Bellafiore, after Mr. Manning refused to undergo a closed MRI/MRA, he had no choice but to recommend an open MRI, even though he considered a closed MRI/MRA to be the "best choice."[12] Indeed, he testified that at that time he did not believe that an open MRI machine was sensitive enough to produce MRA-quality images of the blood vessels.[13] On a March 5, 1998 assessment and recommendation form, Dr. Bellafiore noted that Mr. Manning could undergo an "MRA as [an] outpatient." At trial, he explained that such a test would have been performed at a later date in a closed MRI/MRA machine "if [Mr. Manning] would agree to * * * that." Despite Dr. Bellafiore's stated preference for the closed MRI/MRA examination, he characterized Mr. Manning's purported choice to wait until the open MRI machine was operational as "a rational decision." He did not document Mr. Manning's alleged refusal to undergo a closed MRI/MRA examination in his treatment notes, nor did he document his intention to order an open MRI for Mr. Manning. Doctor Bellafiore did, however, add the phrase "in an open architecture" to Dr. McNiece's March 5, 1998 order for an "MRI head at Rhode Island Hospital." He also testified that he did not seek the assistance of Mrs. Manning in his attempt to persuade her husband to undergo a closed MRI/MRA with conscious sedation until the evening of March 6, 1998. Doctor Bellafiore testified that Mrs. Manning also was unable to persuade Mr. Manning.

Doctor Bellafiore testified that on March 6, 1998, he discussed an additional option for diagnosing Mr. Manning's condition: a conventional catheter angiogram.[14] South

---

**10.** Conscious sedation must be administered by an anesthesiologist or other qualified provider.

**11.** General anesthesia is the deepest form of sedation. It renders the patient unconscious and must be performed by an anesthesiologist.

**12.** Significantly, Dr. McNiece testified that he had no knowledge of Mr. Manning having refused conscious sedation.

**13.** Doctor Bellafiore testified that some time after writing the open MRI order, he talked to a radiologist at Rhode Island Hospital who informed him that it was possible to "get some information from the [MRA] in the open machine." Nevertheless, Dr. Bellafiore acknowledged at trial that he was aware that an MRA in an open machine would not produce as detailed an image of Mr. Manning's brain as would an MRA in a closed machine.

**14.** A conventional catheter angiogram is an invasive radiological procedure in which a dye is injected into the blood vessels to get an

County Hospital did not perform cerebral catheter angiograms in 1998, nor did it perform angioplasties.[15] He recounted explaining to Mr. Manning that an angiogram carried a 1 to 3 percent risk of "significant morbidity," including clotting, bruising, infection, and, most seriously, stroke; and he further recalled strongly recommending that Mr. Manning undergo the open MRI examination instead. Doctor Bellafiore testified that, after considering the risks, Mr. Manning declined the angiogram because of a bad childhood experience. Dr. Bellafiore characterized this as an "informed, intelligent decision[ ]." Again, Dr. Bellafiore failed to document Mr. Manning's refusal to undergo this procedure. Doctor Bellafiore testified that on the morning of March 7, 1998, he finally was able to persuade Mr. Manning to undergo a closed MRI/MRA examination with conscious sedation, but he was aware at that time that a machine would not be available through the network until March 9, 1998.

The plaintiff vigorously disputed Dr. Bellafiore's contention that he had frequently offered Mr. Manning conscious sedation as a means of completing the MRI/MRA examination and repeatedly pointed out that, in both his answers to interrogatories and his deposition testimony, Dr. Bellafiore had failed to mention offering this option.[16] For instance, in interrogatory No. 18, plaintiff asked Dr. Bellafiore to reveal "any and all conversations [he] had with any person concerning the care and/or treatment of Michael Manning * * *." Doctor Bellafiore answered by first referring to an earlier response in which he did not mention conscious sedation and then directing plaintiff to the medical records generally. He also stated obliquely that he "spoke with [Mr. Manning] and his wife during his admission," without revealing any of the substance of these conversations. Also, when asked in another interrogatory to list the available alternatives to an open MRI for a comparable evaluation of Mr. Manning, Dr. Bellafiore responded only that "[o]n March 5, 1998, after learning that the patient was unable to tolerate the MRI, I called the MRI Network of RI in an attempt to obtain an MRI in an open machine." Similarly, Dr. Bellafiore failed to disclose at his deposition that he offered Mr. Manning conscious sedation. Indeed, the following colloquy occurred during Dr. Bellafiore's deposition:

"[Counsel]: Well, when you talked to [Mr. Manning] on the 5th in the morning you were asking him whether he'd undergo an MRI if he had more sedation, is that right?

"[Dr. Bellafiore]: Right.

"[Counsel]: Where was he going to undergo an MRI if he had more sedation?

"[Dr. Bellafiore]: In any closed machine that was available through the MRI network.

"[Counsel]: And so what did you tell Mr. Manning about sedation?

"[Dr. Bellafiore]: I said we could try giving him more Ativan to make him a little sleepier to see if he could tolerate the test."

---

image of the affected area. Stedman's Medical Dictionary 86 (28th ed. 2006). This procedure was acknowledged to be the "gold standard" for imaging by both Doctors McNiece and Bellafiore.

15. Angioplasty is a technique for dislodging an obstruction by inflating small balloons inside the blood vessel. Stedman's Medical Dictionary 88 (28th ed. 2006).

16. During the trial, plaintiff moved for default judgment, alleging that Dr. Bellafiore deliberately withheld this crucial information during discovery. The trial justice initially reserved judgment on this motion.

When asked "[i]s there any reason why Mr. Manning couldn't have been sedated with the assistance of anesthesiology on March 4th in order to accomplish the MRI?" Dr. Bellafiore eventually responded that "it's a dangerous procedure to give someone general anesthesia or anesthetic who is having a potential stroke." Doctor Bellafiore appeared to buttress this answer later in his deposition when asked, "[W]hat was the risk posed to Mr. Manning in particular if he had undergone sedation short of general anesthesia, what was the risk that his blood pressure would alter to an extent that would be life threatening?" He ultimately responded: "I don't know a percentage number, but I would say that the chances are great enough that you would want to attempt the open MRI first." Doctor Bellafiore testified that he "need[ed] to rely on [his] attorney to fill out" his answers to plaintiff's interrogatories, and he attributed his seemingly incomplete deposition answers to "confusion in my mind at certain points" about the meaning of the term "sedation."

The jury also heard testimony from various expert witnesses. Doctor Putman devoted the majority of his testimony to detailing his care of Mr. Manning at MGH. At trial, Dr. Putman was shown enlarged pictures of the images taken while he performed Mr. Manning's angiogram. In reviewing those images, Dr. Putman concluded that the clot that triggered Mr. Manning's stroke was caused by a left arterial dissection rather than atherosclerosis. He also testified, however, that a patient in Mr. Manning's specific circumstances treated at a tertiary care hospital according to the standard of care would have received imaging of the blood vessels in his brain and neck on March 5, 1998. The imaging would have allowed Mr. Manning's physicians to locate the blockage, and he believed angioplasty would have been highly successful at dislodging the obstruction. Such treatment, according to Dr. Putman, would have likely prevented Mr. Manning's second devastating stroke.

David Gelber, M.D., a neurologist and professor at Southern Illinois University School of Medicine, testified on behalf of plaintiff. Doctor Gelber stated that the standard of care required Dr. Bellafiore to administer the anticoagulant Heparin, which he testified was more effective than aspirin at breaking up blood clots. Doctor Gelber also testified that "good stroke management requires you to identify what the cause of the stroke was in order to best treat [it] and prevent the next one[.]" Doctor Gelber testified that Dr. Bellafiore's treatment of Mr. Manning fell below the standard of care because he failed to get a definitive diagnosis by completing the MRI/MRA examination. He also testified that a conventional catheter angiogram would have been an effective alternative means of locating Mr. Manning's stroke. He acknowledged the slight risk of an allergic reaction to the dye or the dislodging of plaque associated with conducting a conventional angiogram, but he said the need "to know what was going on" far outweighed the minimal risks. Doctor Gelber discounted the open MRI as an option for locating the cause of Mr. Manning's stroke because it would not allow for a high-quality MRA image, and instead he characterized conscious sedation in a closed MRI/MRA machine as the best option. Moreover, he stated that transferring Mr. Manning by ambulance to another hospital with a closed MRI/MRA machine would have created no additional risk that would have outweighed the urgent need for imaging. He testified that with timely treatment, Mr. Manning's long-term prognosis would have been good, with possible peripheral visual impairment as the only lasting consequence of his initial stroke.

Daniel Hanley, M.D., a neurologist at The Johns Hopkins Hospital, also testified on behalf of plaintiff. He first testified that Dr. Bellafiore's initial differential diagnosis was appropriate. Doctor Hanley then went on to criticize Dr. Bellafiore for failing to obtain high-quality imaging of the vertebral basilar system within twenty-four hours of Mr. Manning's admission. He stated that this test would have ruled out possible causes listed on the differential diagnosis, and he concluded that Dr. Bellafiore "[chose] the most benign of diagnoses and accept[ed] them without evidence." He stated that Dr. Bellafiore could have obtained the image by an MRA, a CT scan angiogram, or a conventional cerebral angiogram, the latter of which he characterized as the "gold standard evaluation." Under the standard of care, Dr. Hanley testified that a physician may persist in seeking an MRA, rather than pursuing other means of imaging, only "if [he or she is] able to obtain the [MRA] * * * within that 24-hour time period." If the occlusion had been located, prompt treatment would have included administering the clot-buster Heparin, elevating the patient's blood pressure, and performing an angioplasty to dislodge the obstruction. Instead, Dr. Bellafiore ordered an open MRI examination on March 5, 1998, which Dr. Hanley testified fell below the standard of care because it could not provide a sufficiently detailed image of the affected area to locate the cause of the blockage. Doctor Hanley also testified that a reasonably prudent doctor in Dr. Bellafiore's position would have documented his efforts to convince a patient to undergo a closed MRI/MRA examination with the assistance of conscious sedation.

Theodore Larson, III, M.D., an interventional neuroradiologist and professor at Vanderbilt University, was the first expert to testify on behalf of Dr. Bellafiore. He explained that 15 to 20 percent of patients have claustrophobic reactions in a closed MRI/MRA machine. Doctor Larson opined that Mr. Manning did not have a dissection of the left vertebral artery, but rather his stroke was caused by vascular atherosclerotic disease. He indicated that the risk of a second stroke is higher with atherosclerotic disease because the plaque can break off and clot again. For this reason, he testified, transporting Mr. Manning would have been dangerous. He conceded, however, that if Mr. Manning had, in fact, suffered a dissection of the left vertebral artery, then there would have been no risk in transporting him. Doctor Larson also stated that "there is no data that suggests that [H]eparin is better than aspirin for treatment of lesions at the origin of the vertebral artery." Finally, Dr. Larson admitted that he did not conclude that Mr. Manning had atherosclerosis in his vertebral artery when reviewing the medical records before his deposition. Rather, he arrived at this determination after observing the enlarged trial exhibits of the angiogram images that Dr. Putman took.

Daryl Gress, M.D., a neurologist trained in stroke intervention, also testified on behalf of Dr. Bellafiore. He also attributed Mr. Manning's stroke on March 4, 1998, to a buildup of atherosclerotic plaque. Doctor Gress testified that Dr. Bellafiore met the standard of care by obtaining a CT scan within twenty-four hours of admission and that no other test was necessary. He conceded that if it became clear that his patient's stroke was caused by a dissection he would prescribe Heparin rather than aspirin. Moreover, he admitted that he would have strongly considered performing a conventional angiogram had no other method of imaging been available.

Lawrence Wechsler, M.D., a neurologist at the University of Pittsburgh, was the final expert witness to testify on behalf of

Dr. Bellafiore. Doctor Wechsler opined that Mr. Manning's stroke was the result of a blockage in the vertebral artery caused by atherosclerotic plaque. He indicated that Dr. Bellafiore met the standard of care by prescribing aspirin. Doctor Wechsler testified that it would have made no difference if Mr. Manning had completed an MRI/MRA examination because his treatment would have remained limited to antiplatelet treatment. Moreover, he stated that performing a conventional catheter angiogram would not have been appropriate because of the risks. On cross-examination, Dr. Wechsler conceded that he had not reviewed the angiogram images that Dr. Putman took, but he stated that he still disagreed with Dr. Putman's determination that a dissection was the cause of Mr. Manning's stroke.

At the close of all the evidence, the jury returned a verdict in favor of all the defendants. The plaintiff filed a timely motion for judgment as a matter of law or, in the alternative, a new trial. The plaintiff argued that a new trial was justified both because Dr. Bellafiore had withheld vital information during the discovery process and also because the jury's verdict was against the weight of the evidence. The trial justice issued a forty-four page ruling on plaintiff's motions in which he extensively reviewed the evidence against Dr. Bellafiore.

The trial justice explained that he had reserved judgment on plaintiff's initial motion for default judgment because he believed at the time that the jury would not find credible Dr. Bellafiore's testimony that he had discussed conscious sedation with Mr. Manning and that he had refused treatment. He further explained,

"In the midst of a lengthy, hotly contested medical malpractice case, the failure to disclose such an important defense was not only critical, it left the court in the midst of a dilemma for which there was no just resolution (not to mention the disarray to the extensively prepared plaintiffs' case). At trial, the Court suspected that the credibility of Dr. Bellafiore would be significantly lessened when such an obvious, pivotal fact was not disclosed in sworn answers. Apparently, the jury did not recognize the gravity of this flagrant discovery abuse. In hindsight, the injustice was never cured. The Court only precluded the fact finder in its quest for the truth, when its proper role was to accommodate the fact finder within the confines of the rules and fairness."

In comparing Dr. Bellafiore's trial testimony with his earlier deposition and written disclosures, the trial justice concluded that the proper remedy was to order a new trial. He also found that a new trial was justified because the jury's verdict was against the fair preponderance of the evidence.[17]

On appeal, Dr. Bellafiore argues that the trial justice abused his discretion in granting plaintiff's motion for a new trial to sanction what the trial justice called Dr. Bellafiore's "blatant discovery abuse." Additionally, Dr. Bellafiore contends that the trial justice's determination that the jury's verdict was against the weight of the evidence was clearly wrong.

## II

### Standard of Review

"The role of a trial justice in considering a motion for a new trial is

17. The trial justice, reviewing the testimony, also determined that a reasonable jury could have found in favor of Dr. McNiece and South County Hospital. Accordingly, he denied plaintiff's motion for a new trial against those parties.

well-established." *Murray v. Bromley,* 945 A.2d 330, 333 (R.I.2008). "When ruling on a motion for a new trial, the trial justice acts as a 'superjuror' and 'should review the evidence and exercise his or her independent judgment in passing upon the weight of the evidence and the credibility of the witnesses.'" *Seddon v. Duke,* 884 A.2d 413, 413 (R.I.2005) (mem.) (quoting *Franco v. Latina,* 840 A.2d 1110, 1111 (R.I.2004)). "In carrying out the function of 'superjuror,' the trial justice should adhere to the following principles:

> 'The trial justice may accept some or all of the evidence. [He or she] may reject evidence that is impeached or contradicted by other positive testimony or circumstantial evidence. Or [he or she] may disregard testimony that contains inherent improbabilities or contradictions or which is totally at variance with undisputed physical facts or laws. [He or she] may also add to the evidence by drawing proper inferences.'" *Murray,* 945 A.2d at 333 (quoting *Candido v. University of Rhode Island,* 880 A.2d 853, 856 (R.I.2005)).

"The trial justice should allow the verdict to stand if he or she 'determines that the evidence is evenly balanced or is such that reasonable minds, in considering that same evidence, could come to different conclusions * * *.'" *Seddon,* 884 A.2d at 413–14 (quoting *Franco,* 840 A.2d at 1111). "A trial justice may set aside a verdict 'when [his or her] judgment tells [him or her] that it is wrong because it fails to respond truly to the merits of the controversy and to administer substantial justice and is against the fair preponderance of the evidence.'" *Murray,* 945 A.2d at 333 (quoting *Candido,* 880 A.2d at 856).

██ "On appeal, 'this Court will affirm a trial justice's decision on a motion for a new trial as long as the trial justice conducts the appropriate analysis, does not overlook or misconceive material evidence, and is not otherwise clearly wrong.'" *Murray,* 945 A.2d at 334 (quoting *Morrocco v. Piccardi,* 674 A.2d 380, 382 (R.I. 1996)). "[W]hen we review a trial justice's ruling on a motion for new trial, we afford it 'great weight.'" *Bajakian v. Erinakes,* 880 A.2d 843, 851–52 (R.I.2005) (quoting *Sarkisian v. NewPaper, Inc.,* 512 A.2d 831, 835 (R.I.1986)).

## III

### Discussion

██ In his decision granting plaintiff's motion for a new trial, the trial justice provided a detailed summary of all the testimony elicited at trial. Moreover, he made specific credibility findings for many of the key expert witnesses. He observed that Dr. Putman was "honest and straightforward[,]" and "thorough in his work, capable, and impressive." Moreover, after reviewing the testimony of Dr. Hanley, the trial justice found it to be "virtually impenetrable on cross-examination." Observing that Dr. Hanley was "explanatory and logical" throughout his testimony, the trial justice found him credible. Taking the testimony of Doctors Gelber, Putman, and Hanley together, the trial justice found that they had established a standard of care for Mr. Manning's treatment.

The trial justice found that the standard of care required prompt imaging of the circle of Willis that would have identified the cause of Mr. Manning's stroke. He further found that such prompt imaging, either by an MRI/MRA or a conventional angiogram would have revealed the dissection in Mr. Manning's left vertebral artery. The trial justice found that a timely diagnosis would have allowed for proper treatment, including Heparin, and a probable transfer to a different hospital so that the patient could undergo angioplasty. The trial justice was convinced that Dr. Bellaf-

iore deviated from this standard of care by failing to obtain an MRI/MRA or conventional angiogram image within twenty-four hours of Mr. Manning's admission. He also was persuaded that Dr. Bellafiore deviated from the standard of care by administering aspirin instead of Heparin.

The trial justice determined that Dr. Bellafiore's testimony "further and best supports the proposition that he failed to meet the standard of care." The trial justice noted that Dr. Bellafiore agreed that Mr. Manning required prompt imaging when he was admitted on March 4, 1998. Further, Dr. Bellafiore conceded that South County Hospital did not perform angioplasties in 1998. Most crucially, the trial justice did not find credible Dr. Bellafiore's testimony that he had offered Mr. Manning the option of conscious sedation to achieve the closed MRI/MRA examination. He noted that Dr. Bellafiore did not document these purported discussions in any of his medical records, nor did he disclose this seemingly essential fact during pretrial discovery despite myriad opportunities. The trial justice concluded that "the jury was significantly challenged in adopting Dr. Bellafiore's interpretations of the facts."

The trial justice also reviewed the testimony of Dr. Bellafiore's expert witnesses and found them less credible. Specifically, he characterized Dr. Larson's assertion that Mr. Manning's stroke was caused by atherosclerotic plaque buildup rather than a dissection to be "unconvincing." He noted that Dr. Putman had testified in great detail that Mr. Manning's stroke was caused by a dissection in his left vertebral artery and not atherosclerotic plaque. The trial justice also found that Dr. Gress's testimony was of little probative value because he refused to articulate a standard of care when discussing Mr. Manning's treatment. Finally, the trial

justice did not find Dr. Wechsler to be credible because he concluded that atherosclerosis was the cause of Mr. Manning's stroke without ever reviewing the CT angiogram images. Moreover, the trial justice noted that Dr. Wechsler "rarely provid[ed] any basis for his opinions."

Doctor Bellafiore contends that the trial justice relied on several material misconceptions of the evidence that require reversal and reinstatement of the jury's verdict. First, he argues that the trial justice erred by not making a specific credibility determination concerning Dr. Gelber. . Additionally, Dr. Bellafiore avers that the trial justice mistakenly stated that Dr. Gelber testified that Mr. Manning was never definitively diagnosed with a stroke in the days after his admission. We do not discern any material error in the trial justice's discussion of Dr. Gelber's testimony.

We first note that a trial justice need not make specific credibility determinations for every witness. *See State v. Reyes*, 984 A.2d 606, 618 (R.I.2009) (quoting *State v. Tate*, 109 R.I. 586, 588–89, 288 A.2d 494, 496 (1972) ("we do not require trial justices to 'literally tag the testimony of each witness as "credible" or "incredible" ' ")). Nevertheless, it is clear from the trial justice's decision that he viewed Dr. Gelber as credible and even went so far as to state that he relied on Dr. Gelber to determine the standard of care. Moreover, Dr. Gelber did indeed criticize Dr. Bellafiore's failure to diagnose the cause of Mr. Manning's stroke and noted that Dr. Bellafiore had failed to rule out alternate diagnoses until March 6, 1998. We therefore find no merit in Dr. Bellafiore's argument that the trial justice's discussion of Dr. Gelber's testimony contained material errors.

Next, Dr. Bellafiore contends that the trial justice erred by describing Dr. Hanley as a "neurosurgeon and neurolo-

gist" when he was, in fact, a neurologist. Although the trial justice clearly mischaracterized Dr. Hanley's field of medical expertise, we are well satisfied that the trial justice did not misconceive any material aspects of Dr. Hanley's testimony. More significantly, Dr. Bellafiore argues that the trial justice erroneously accepted Dr. Hanley's testimony that Dr. Bellafiore breached the standard of care by not discussing with Mrs. Manning the risks and benefits of the various imaging alternatives. A review of the trial justice's decision in its entirety, however, demonstrates that he found the jury's verdict flawed because (1) the expert testimony established that the appropriate standard of care required prompt imaging, and (2) Dr. Bellafiore's testimony that he had discussed sedation alternatives with Mr. Manning himself was of questionable credibility because, among other things, the doctor could provide no documentation. We are satisfied, therefore, that any conversations Dr. Bellafiore may or may not have had with Mrs. Manning did not significantly contribute to the granting of a new trial.

Doctor Bellafiore also criticizes the trial justice for mistakenly referring to Dr. Putman as "Dr. Putnam" and describing him as a "neuro-interventional radiologist" rather than an interventional neuro-radiologist. Additionally, Dr. Bellafiore notes that the trial justice favorably discussed Dr. Putman's purported admission that he mistakenly believed Mr. Manning's stroke was related to performing heavy lifting at work when, in fact, Dr. Putman denied making such a conclusion. Again, this error was not material to Dr. Putman's core testimony about Mr. Manning's treatment at MGH and the standard of care.

Doctor Bellafiore also argues that the trial justice materially misconceived the evidence deduced from the expert wit-

nesses for the defense. He notes that the trial justice seemingly erred in believing that Dr. Larson was involved in Mr. Manning's care. Doctor Bellafiore also points out that the trial justice erroneously characterized Dr. Gress as a neuroradiologist rather than a neurologist. We do not believe either of these misstatements by the trial justice is sufficient to require reversal of his new trial order.

We have thoroughly reviewed the trial justice's decision in its entirety and conclude that he adequately discharged his responsibility to "independently weigh, evaluate, and assess the credibility of the trial witnesses and evidence." *Wellborn v. Spurwink/Rhode Island,* 873 A.2d 884, 887 (R.I.2005) (quoting *Graff v. Motta,* 748 A.2d 249, 255 (R.I.2000)). He began his analysis by acknowledging the plaintiff's theories of the case, *viz.,* that Dr. Bellafiore breached the standard of care by failing to obtain prompt medical imaging, failing to administer Heparin as a blood thinner, and failing to apprise Mr. Manning of the options available for accomplishing the imaging. After considering the voluminous evidence, determining the credibility of the witnesses, and weighing the testimony of the various expert witnesses, the trial justice found that "[t]he jury was confronted with substantial information which established that the standard of care for treatment of a potential stroke patient required prompt imaging." He further found that the plaintiff had "established that prompt imaging did not occur." Accordingly, he determined that the jury's verdict concerning Dr. Bellafiore was against the fair preponderance of the evidence and failed to do justice or respond to the merits of the controversy. It is our conclusion that the trial justice conducted the appropriate analysis, did not overlook or misconceive material evi-

dence, and was not otherwise clearly wrong.

## IV

### Conclusion

For the reasons set forth in this opinion, the order of the Superior Court is affirmed and the papers of the case shall be returned to the Superior Court.

Justice GOLDBERG did not participate.