**Supreme Court**

No. 2013-352-Appeal.
(WC 10-613)

Wayne Bitgood                               :

v.                               :

Gordon Greene Post Number 27 of the        :
American Legion.

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Wayne Bitgood                          :

v.                          :

Gordon Greene Post Number 27 of the          :
American Legion.

Present: Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**   A barroom altercation led to a jury verdict awarding $448,130 in damages to the plaintiff, Wayne Bitgood, on his negligence claim against Gordon Greene Post Number 27 of the American Legion (Post 27 or defendant).  The jury also determined that the plaintiff's own negligence was a proximate cause of his injuries and attributed twenty percent of the overall negligence to him.  Post 27 now appeals from the Superior Court judgment, contending that the trial justice erred in denying its motion for a new trial and/or remittitur.  This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

On the evening of February 4, 2009, Bitgood and Ryan Gardiner were patrons at the bar on defendant's premises. Two physical altercations occurred between the men; the first inside the bar, and the second in defendant's parking lot approximately ten to fifteen minutes later. The plaintiff sustained serious injuries, requiring a two-week stay in the hospital and two months at home to recover. In April 2010, plaintiff filed a complaint in the Providence County Superior Court, alleging that his injuries resulted from defendant's negligence. In its answer, defendant claimed comparative negligence and improper venue among various affirmative defenses. Pursuant to defendant's motion to change venue, the case was transferred to Washington County in July 2010. The case was tried before a jury in the Washington County Superior Court in May 2013.

While there was no dispute that Gardiner assaulted plaintiff twice within a fifteen-minute period, none of the trial witnesses relayed why or how the altercations began. The plaintiff testified that he had no memory of the incident. His last memory of the evening was driving his truck to the end of his driveway on his way to Post 27 to pick up a bartender who needed a ride home. The plaintiff stated that he had diabetes, and that if his blood sugar dropped too low "[he is] like in a blackout. [He] can still function but [he does not] know what [he is] doing." Daniel Baruti, the Hopkinton Police Department lieutenant who oversaw the investigation into the incident, testified that the investigation had not revealed how the first incident started.

Robin McCoombs, the bartender on duty the night of the incident, was the only trial witness other than plaintiff who was present in the barroom during the first altercation.[1] She testified that she had observed Gardiner that evening; she described him as belligerent, obnoxious, vulgar, antagonizing other patrons, and looking for a fight. McCoombs saw Gardiner repeatedly punch and kick plaintiff on the floor of the bar, but she did not see how the assault started because her back had been to plaintiff and Gardiner. McCoombs recalled, however, that, shortly before the first altercation began, plaintiff was seated at the bar and Gardiner walked past plaintiff on his way toward the door. From these observations and the location within the barroom of the first fracas, McCoombs inferred that plaintiff "had to walk" to the area of the "initial assault."

Jennifer Place's deposition testimony was read into the record at trial. She was defendant's bar manager, and she testified that Gardiner was "known to have a black belt in karate and he's known to get violent." On the night of the incident, Place was in the hall outside the barroom when the first altercation occurred. She recalled that she went into the bar when she heard yelling, and there she saw Gardiner and plaintiff "in a scuffle on the floor." Once the fighting was over, she watched Gardiner leave the premises and then she spoke with plaintiff. The plaintiff told Place that he was fine and was going to head home. Place stated that she was standing outside on the steps when Gardiner returned "about ten minutes" later. As soon as she realized that Gardiner had returned, she "yelled to the bartender to call the police" and then told Gardiner to get back in his truck. She said that Gardiner replied, "[H]e cut me, he's a dead man." Place testified that she did not see the second altercation because she went inside, but

_____

[1] McCoombs testified as an adverse witness; therefore much of her testimony on direct examination by plaintiff's counsel consisted of responding "yes" or "no" to counsel's leading questions, as well as acknowledging the accuracy of her prior deposition testimony.

that, after she saw Gardiner drive away, she observed plaintiff unconscious and bleeding. The police and rescue arrived minutes later.

At trial, it was undisputed that no one had called the police either during or immediately after the first assault. McCoombs testified that she had not called the police because she had not believed that Gardiner would return. McCoombs also stated that plaintiff had not asked her to call the police and declined her offer to call an ambulance. She acknowledged, however, that she locked the door behind Gardiner after he left. Place testified at her deposition that she had not believed that the police needed to be called after the first altercation. James R. Taft, Sr., then a member of defendant's executive board as finance officer and liaison between the bar manager and the executive board, was in defendant's basement on February 4, 2009 for a meeting. Taft's deposition, which was read into the record during trial, reflected that he went upstairs when he heard a "large commotion," but that "it was relatively calm in the bar when [he] got up there," and the police were not needed because "[t]o the best of [his] knowledge," everything was under control at that point. Taft saw "no damage to the [premises], * * * nobody on the floor, and * * * nobody fighting in the building."

Sergeant Robert Kenyon, a police officer with the Hopkinton Police Department, testified that he was dispatched to Post 27 on the evening of the incident. He arrived less than two minutes after the police station received the call about the disturbance. Sergeant Kenyon testified that, if he had been dispatched either during or immediately after the first altercation, then, based on his location at that time, he would have arrived at Post 27 in five to six minutes (i.e., prior to the second altercation).

Several witnesses testified that defendant had a written policy in place for handling emergency situations. The policy in effect on the date of the incident directed its staff to call the

- 4 -

police when "a situation [got] out of control."[2]  A few months after the incident, defendant changed its policy regarding when its staff were to call the police.  Place testified that the new policy directed staff to call the police "anytime there was even a verbal argument or * * * any physical altercation."  Michael Alger, who took over as Post 27's commander four months after the incident, testified that he created this new policy after he took over as commander in part because "the town licensing board demanded it to be written * * * [and] required [Post 27] to have new guidelines."  The new policy also required bartenders to use a panic alarm whenever they believed a disturbance either might occur or was occurring; the signal from that alarm went directly to the Hopkinton Police Department.

Baruti, who oversaw the investigation into the incident, expressed his opinions regarding the standards of care for maintaining the safety and security of patrons in a bar following a physical altercation, as well as the instructions provided to staff on handling physical altercations that occur on the premises.[3]  He testified that, based on his twenty-three years of experience, the general standard of care "expected" by the law enforcement community was that police would be called during or after each physical altercation "to secure that particular scene and make it safe, not only for the patrons, but also for the people that you're calling to the scene."  Baruti opined that defendant had not met this standard of care because, if the police had been called after the

---

[2] The defendant's Bar Management & Organizational Manual, section 10, paragraph 4 stated that "in the event a situation gets out of control, call 911 and request the local police.  Next call the bar manager to inform of the situation."

[3] While plaintiff's counsel laid an extensive foundation upon which Baruti could have been qualified to testify as an expert witness, the record does not reflect that Baruti was tendered to the court for approval to testify as an expert.  The record does reflect, however, that Baruti provided expert opinion testimony without objection from defendant.  In addition, in the trial justice's ruling on defendant's motion for a new trial and/or remittitur, she treated Baruti's testimony as that of an expert in the area of public safety.  At oral argument before this Court, plaintiff's counsel suggested that discussions occurred off the record in which the parties agreed that Baruti would testify as an expert.

first altercation, then the second altercation would not have occurred. As to the standard of care for the policy and procedures that a bar should have had in place for bar staff confronted with a physical altercation between patrons, Baruti testified that the policy should have been to immediately report the event to the police. Baruti opined that defendant's policy on February 4, 2009 did not meet the standard of care because it allowed the bartenders to make subjective decisions about when a situation was out of control and therefore when to call the police.

At the conclusion of all the testimony, plaintiff submitted several medical affidavits with records and bills attached. The plaintiff testified that he sustained injuries that included a "[l]acerated liver, broken back, damage to [his] right arm, gallbladder removed[,] * * * part of [his] bowel and intestine [removed], and * * * colon damage." He further testified that he spent two weeks in the hospital, then two months at home recuperating. His mother, sister, and nephew took turns looking after his daily needs, and he visited a primary care physician once a month for two years. The plaintiff was admitted again to the hospital two years later on an emergency admission to remove a stitch that had been left inside his abdomen from one of the operations conducted immediately after the incident. The plaintiff testified that, during the eighteen years before his injuries, he did "all construction work, concrete, running equipment, all labor stuff," either for "Triton Marine on the New London sub base" or at Cherenzia Excavation in Westerly. The plaintiff began "light duty" work on a part-time basis four months after the incident. His return to work was against his doctor's recommendation, but plaintiff stated that he "had bills to pay, no money coming in." The plaintiff "pretty much" resumed normal duties and full-time hours six months after the incident. At the end of the trial, plaintiff requested damages that included reimbursement for medical bills, lost wages, and pain and suffering.

The jury returned a verdict that found both parties negligent and attributed eighty percent of the negligence to defendant and twenty percent of the negligence to plaintiff. The jury awarded $448,130 to plaintiff, which represented the full amount plaintiff had requested. After reducing the award by twenty percent for plaintiff's comparative negligence and adding statutory interest at the rate of twelve percent, the total amount awarded to plaintiff was $543,433.13. The defendant thereafter filed a motion for a new trial and/or remittitur (for a reapportionment of comparative negligence) pursuant to Rule 59 of the Superior Court Rules of Civil Procedure. At a hearing on June 13, 2013, the trial justice denied the motion. The defendant timely appealed.

## II

## Standard of Review

When a trial justice considers a motion for a new trial, she or he steps into the role of a juror, reviews the evidence in light of the instructions previously given to the jury, and exercises independent judgment regarding the credibility of the witnesses and the weight of the evidence. Connor v. Schlemmer, 996 A.2d 98, 114 (R.I. 2010).

> "In carrying out the function of superjuror, the trial justice should adhere to the following principles: [t]he trial justice may accept some or all of the evidence. [He or she] may reject evidence that is impeached or contradicted by other positive testimony or circumstantial evidence. Or [he or she] may disregard testimony that contains inherent improbabilities or contradictions or which is totally at variance with undisputed physical facts or laws. [He or she] may also add to the evidence by drawing proper inferences." Manning v. Bellafiore, 991 A.2d 399, 408 (R.I. 2010) (quoting Murray v. Bromley, 945 A.2d 330, 333 (R.I. 2008)).

"The trial justice should allow the verdict to stand if he or she 'determines that the evidence is evenly balanced or is such that reasonable minds, in considering that same evidence, could come to different conclusions * * *.'" Manning, 991 A.2d at 408 (quoting Seddon v. Duke, 884 A.2d 413, 413-14 (R.I. 2005) (mem.)). The trial justice sets aside a verdict "when [his or

her] judgment tells [him or her] that it is wrong because it fails to respond truly to the merits of the controversy and to administer substantial justice and is against the fair preponderance of the evidence." Connor, 996 A.2d at 115 (quoting Murray, 945 A.2d at 333). In his or her decision, "the trial justice need not engage in an exhaustive review and analysis of all of the evidence and testimony presented at trial * * * [but] need only make reference to such facts disclosed by the testimony as have motivated his or her conclusion." Bourdon's, Inc. v. Ecin Industries, Inc., 704 A.2d 747, 758 (R.I. 1997) (quoting Kwarciak v. Star Market, 506 A.2d 545, 547 (R.I. 1986)) (emphasis omitted).

This Court gives "great weight" to a trial justice's ruling on a motion for a new trial. Botelho v. Caster's, Inc., 970 A.2d 541, 546 (R.I. 2009). This Court will affirm a trial justice's decision on a motion for a new trial "as long as the trial justice conducts the appropriate analysis, does not overlook or misconceive material evidence, and is not otherwise clearly wrong." Connor, 996 A.2d at 115 (quoting Murray, 945 A.2d at 334). We conduct a similar review of a trial justice's decision on a motion for remittitur, and we determine whether he or she overlooked or misconceived material evidence. See Lennon v. Dacomed Corp., 901 A.2d 582, 590 (R.I. 2006).

### III

### Discussion

### A

### Motion for a New Trial

The defendant argues that the trial justice was clearly wrong to deny its motion for a new trial because the evidence was not evenly balanced. The defendant contends that the testimony regarding Gardiner's reputation was outweighed by the testimony from McCoombs, Place, and

Taft that the police were not needed after the first altercation because the situation was under control. Since the altercation was over and Gardiner had left the premises, defendant argues, it did not breach its "duty to exercise reasonable care to protect [plaintiff] from reasonably foreseeable harm at the hands of Gardiner" by not calling the police. The defendant highlights the trial justice's finding that McCoombs was credible and consistent in her testimony that she did not believe that either the first altercation was out of control or that a second one would occur.

The plaintiff counters that, given the evidence on record regarding Gardiner's reputation, "a reasonably prudent person would have called the police" immediately upon the first sign of an attack. The plaintiff also argues that the evidence presented regarding defendant's change in policy also supported the jury's verdict because the adoption of the stricter policy was evidence of defendant's negligence.

At the hearing on defendant's motion, the trial justice articulated the standard of review for a new trial motion and then summarized the evidence presented at trial. The trial justice found that McCoombs, the only witness other than plaintiff who was both present in the barroom and who testified in person at trial, was "credible and unwavering in her testimony that she did not believe that the first altercation was out of control, or that there would be a second altercation." The trial justice also commented, however, that McCoombs twice testified to locking the door after Gardiner left "to, quote, make sure that he did not come back in." The trial justice highlighted the undisputed fact that defendant changed its emergency situation policy after the incident, and she commented that the jury was instructed that they could consider this subsequent remedial measure when deciding whether defendant breached its duty. The trial justice stated that the credible evidence established "not only that an altercation took place * * *

but that Gardiner was known to the staff as having a reputation of being violent, that he was acting obnoxious and belligerent and looking for a fight, that he set [plaintiff] as his target * * *." The trial justice concluded that "[t]he credible evidence presented was so evenly balanced and such that different minds can naturally and fairly come to different conclusions on the defendant's liability for negligence. Accordingly, this Court is required to deny the motion for a new trial."

Based on our review of the record, we are well satisfied that the trial justice engaged in the appropriate analysis of defendant's motion, neither overlooked nor misconceived material evidence, and was not otherwise clearly wrong. When the evidence is evenly balanced, a jury verdict must stand. Manning, 991 A.2d at 408. We therefore affirm the denial of defendant's motion for a new trial.

**B**

**Alternate Motion for Remittitur**

The defendant also argues that the trial justice was clearly wrong when she denied its alternative motion for remittitur because this ruling "overlooked the inescapable conclusion that there could not have been a second altercation if the first altercation did not occur and there would not have been the first altercation if [plaintiff] had not voluntarily left the safety of his barstool." The defendant contends that the trial justice overlooked evidence that plaintiff's negligence was either equal to or greater than defendant's negligence, including Place's testimony that plaintiff turned down an offer to call an ambulance and plaintiff's failure to leave its premises immediately after the first altercation. During oral argument before this Court, defendant also asserted that the trial justice was remiss by not placing more weight on the

reasonable inference that plaintiff chose to approach Gardiner prior to the first altercation notwithstanding Gardiner's reputation.

A trial justice can employ the mechanism of remittitur to either "reassess an erroneous damage award" or "correct a jury's misapportionment of liability as it may relate to comparative negligence." Cotrona v. Johnson & Wales College, 501 A.2d 728, 734 (R.I. 1985). A remittitur is appropriate when a "jury award clearly appears to be excessive or is found to be the result of the jury's passion and prejudice." Lennon, 901 A.2d at 590.

At the hearing, the trial justice noted that it:

> "was clear * * * that the plaintiff was negligent in getting out of his seat in the first instance and walking to where Gardiner was between the end of the bar and the door; the point at which the first altercation ensued. * * * [T]his was not a wise move for the plaintiff[] [a]nd the jury responded accordingly by finding him 20 percent comparatively negligent."

She ruled that "the apportionment rendered by the jury does respond truly to the merits of the controversy. It administers substantial justice, and is supported by the fair weight of the evidence" because the worst of plaintiff's injuries occurred during the second altercation. The damage award was, therefore,

> "largely attributed to the events [that occurred] after it was determined that the police would not be called following the first altercation. It is only just that the apportionment reflect that the plaintiff's negligence[,] while contributing to his injuries[,] was not the same or greater than [defendant's] negligence for failing to protect the plaintiff from reasonably foreseeable harm at the hand of Gardiner by failing to call the police after the first altercation took place."

We are satisfied that the trial justice clearly engaged in a thorough analysis of the defendant's alternate motion for a reapportionment of the plaintiff's comparative negligence.

There is no indication that the trial justice either overlooked or misconceived material evidence. We therefore uphold her denial of the motion. <u>See</u> <u>Lennon</u>, 901 A.2d at 590.

**IV**

**Conclusion**

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.

Justice Flaherty did not participate.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**     Wayne Bitgood v. Gordon Greene Post Number 27 of the
American Legion.

**CASE NO:**     No. 2013-352-Appeal.
(WC 10-613)

**COURT:**     Supreme Court

**DATE OPINION FILED:**     January 16, 2015

**JUSTICES:**     Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ.

**WRITTEN BY:**     Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**     Washington County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Kristin E. Rodgers

**ATTORNEYS ON APPEAL:**

For Plaintiff:  Eric B. DiMario, Esq.

For Defendant:  Lewis J. Paras, Esq.