John CANDIDO

v.

## UNIVERSITY OF RHODE ISLAND et al.

### No. 2003–412–Appeal.

Supreme Court of Rhode Island.

Sept. 2, 2005.

Ronald J. Resmini, Providence, for Plaintiff.

C. Russell Bengtson, Providence, for Defendant.

Present: WILLIAMS, C.J.,
GOLDBERG, FLAHERTY, SUTTELL,
and ROBINSON, JJ.

## OPINION

PER CURIAM.

The plaintiff, John Candido, appeals from the Superior Court's denial of his motion for a new trial, which he had filed after an adverse jury verdict. This case came before the Supreme Court for oral argument on December 7, 2004, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After hearing the arguments of counsel and examining the memoranda submitted by the parties, we are of the opinion that cause has not been shown and that this case should be summarily decided. For the reasons set forth herein, we affirm the order of the Superior Court denying the plaintiff's motion for a new trial.

### Facts and Travel of the Case

The plaintiff brought a negligence claim against defendants, the University of Rhode Island (URI) and the Rhode Island Board of Governors for Higher Education, seeking damages for the severe injuries that he sustained after falling on the URI campus on the night of September 6, 1997.[1]

At the conclusion of a trial extending from May 5, 2003 to May 12, 2003, a jury answered "no" to the following special interrogatory propounded by the trial justice: "Do you find that Plaintiff proved that Defendants were negligent *and* that Defendants' negligence was a proximate cause of Plaintiff's injuries on September 6, 1997?" (Emphasis in original.)

The plaintiff then filed a motion for a new trial, which motion was heard on June 6, 2003. The trial justice denied that motion, and Mr. Candido now appeals.

On appeal, plaintiff argues that the trial justice was clearly wrong in denying his motion for a new trial because (according to plaintiff) the trial justice overlooked and misconstrued material evidence concerning

---

1. At the time of his accident Mr. Candido was a freshman at the University of Rhode Island (URI), having arrived on campus just two or three days previously. He was a resident of the Browning Hall dormitory. We shall explain the factual context of his fall and resultant injury in much greater detail later in this opinion.

the existence of a defect in the asphalt on the URI campus where plaintiff fell, its role in causing his injuries, and the widespread pedestrian use of that same area.[2] The plaintiff also contends that the trial justice committed error when, in the course of denying the motion for a new trial, he relied upon this Court's decision in *Maslen v. Cicchelli*, 621 A.2d 183 (R.I. 1993)(mem.).

## Standard of Review

It is well settled that, when considering a new trial motion, the trial justice's role is that of a "superjuror." *Franco v. Latina*, 840 A.2d 1110, 1111 (R.I. 2004); *Long v. Atlantic PBS, Inc.*, 681 A.2d 249, 254 (R.I.1996). The trial justice must review the trial evidence in light of the jury charge, and he or she must also independently assess the weight of the evidence and the credibility of the witnesses, drawing all reasonable inferences therefrom. *Long*, 681 A.2d at 254; *see also Barbato v. Epstein*, 97 R.I. 191, 193, 196 A.2d 836, 837 (1964) ("[The trial justice's] duty is to consider in the exercise of his independent judgment all of the material evidence in the case in the light of his charge to the jury and to pass on its weight and the credibility of the witnesses."). In carrying out that function, the trial justice should be guided by the following principles:

"The trial justice may accept some or all of the evidence. He may reject evidence that is impeached or contradicted by other positive testimony or circumstantial evidence. Or he may disregard testimony that contains inherent improbabilities or contradictions or which is totally at variance with undisputed physical facts or laws. He may also add to the evidence by drawing proper inferences." *Marcotte v. Harrison*, 443 A.2d 1225, 1232 (R.I.1982).

This Court's language in *Barbato v. Epstein* over forty years ago expresses with enduring cogency what is the trial justice's role once he or she has completed the process of reviewing the trial evidence (a process that the Court in *Barbato*, 97 R.I. at 194, 196 A.2d at 837, described as being one of "acceptance, rejection, and addition"):

"On that evidence he decides whether to approve the verdict even against doubts as to its correctness because the evidence is nearly balanced, or is such that different minds can naturally and fairly come to different conclusions thereon; or, in the alternative, to set it aside when his judgment tells him that it is wrong because it fails to respond truly to the merits of the controversy and to administer substantial justice and is against the fair preponderance of the evidence." *Barbato*, 97 R.I. at 194, 196 A.2d at 837.

On appeal, this Court must first determine whether, as revealed by his or her decision, the trial justice conducted the above-delineated functions adequately. *LaBella v. Ortiz*, 841 A.2d 1136, 1139 (R.I. 2004). It is not necessary that the trial justice comment extensively on the evidence that was offered at trial. *Long*, 681 A.2d at 255. It is enough that his or her decision contains sufficient reasoning for this Court to be able to determine whether or not the trial justice's decision was "rationally premised."[3] *Id.*

---

**2.** The plaintiff argues in his brief that "the uncontradicted competent evidence showed that [plaintiff] had in fact tripped on a defect in the pavement that was connected to the roadway and that this was an area that was commonly traveled by students."

**3.** If we find that the trial justice failed to carry out a proper scrutiny of the evidence,

■ If the basis for the trial justice's decision is adequately set forth in the record, this Court is deferential in its review of a trial justice's denial of a motion for a new trial. *Franco*, 840 A.2d at 1112; *English v. Green*, 787 A.2d 1146, 1149 (R.I. 2001). We accord "great weight" to the trial justice's decision with respect to a new trial motion, and we will affirm that decision unless he or she has "overlooked or misconceived material and relevant evidence or is otherwise clearly wrong." *Morrocco v. Piccardi*, 713 A.2d 250, 253 (R.I.1998); *see also English*, 787 A.2d at 1149; *Graff v. Motta*, 748 A.2d 249, 255 (R.I.2000). Accordingly, our review is limited to determining whether or not the trial justice overlooked or misconceived any material and relevant evidence or was otherwise clearly wrong.

## Analysis

■ We have carefully reviewed the trial justice's decision on the motion for a new trial, and we conclude that he properly adhered to the above-summarized standards concerning new-trial motions and properly articulated the basis for his finding that sufficient competent evidence existed to justify the jury's verdict in light of the jury charge.[4] Therefore, we shall affirm the trial justice's decision, unless we determine that he overlooked or misconceived material evidence or was otherwise clearly wrong. *See Morrocco*, 713 A.2d at 253; *see also English*, 787 A.2d at 1149; *Graff*, 748 A.2d at 255. After carefully

reviewing both the trial record and the trial justice's decision, we do not make such a determination. *See, e.g., Long*, 681 A.2d at 254.

In his decision, the trial justice properly reviewed the trial evidence and assessed the credibility of the witnesses. *See Marcotte*, 443 A.2d at 1232. Significantly, the trial justice found that Mr. Candido was not credible as to the location of his fall— which factual issue was, according to the trial justice, "probably the most essential element of [plaintiff's] case." (As one of several bases for his finding as to plaintiff's lack of credibility, the trial justice noted the testimony of plaintiff's father at trial to the effect that his son had at first identified a particular area on the campus as being the one where he had fallen which was different from the area where the son later said was where he had fallen.)

The trial justice also found that plaintiff's testimony about the events preceding the fall was contradicted by the testimony of two fellow students, Brad Thibodeau and Chris Mueller. In the trial justice's estimation, that testimony further undermined plaintiff's credibility as to the route that he took on the night of his accident.

Mr. Candido testified that, on the night of his accident, he left Browning Hall some time after dinner and went to the Terrace Apartments to meet a person named "Frank," whom he had met on campus earlier that day.[5] He said that he remained at Frank's apartment for a couple of hours discussing guitars. While there,

this Court will nevertheless uphold the verdict if, upon a review of the record in a light most favorable to the nonmoving party, we are able to find any competent evidence to support it. *Long v. Atlantic PBS, Inc.*, 681 A.2d 249, 255 (R.I.1996); *Fox v. Allstate Insurance Co.*, 425 A.2d 903, 907 (R.I.1981).

4. The plaintiff has not challenged the jury charge in this case. The jury was properly instructed that plaintiff had the burden of

proof (by a preponderance of the evidence) that defendants owed a duty of care, breached that duty of care, and that the breach of the duty of care was the proximate cause of plaintiff's injury.

5. The Terrace Apartments are student apartments located on Quarry Road, which runs perpendicular to Baird Hill Road.

according to his testimony, Mr. Candido received two voice mail messages from Brad Thibodeau and Chris Mueller—first telling him that they were "out and about checking out frats" and then notifying him that they were returning to Browning Hall.[6]

The plaintiff further testified that he left the Terrace Apartments around midnight and started walking back to Browning Hall. While en route, he met some fellow students (including Brad Thibodeau and Chris Mueller) near Baird Hill Road. Mr. Candido admitted that, at some point, he and Chris Mueller stopped to relieve themselves and then caught up with the rest of the group. Mr. Candido further testified that Chris Mueller ran to catch up with the others while Mr. Candido walked,[7] eventually heading down sloped ground onto an area of broken pavement. He testified as follows:

"The gravity accelerated my walking. Um, my foot had gotten tripped up in I guess what is called the depression, and I had fallen forward while my foot was still stationary."

The testimony of Chris Mueller and Brad Thibodeau offered significantly different versions of the events leading up to plaintiff's fall; and the trial justice found their testimony to be more believable.[8]

Chris Mueller, who resided in Browning Hall, as did the plaintiff, testified that he had met Mr. Candido earlier in the day on September 6, 1997, and that the two made plans to go out that night. At some point after 9 p.m., they went together to the fraternity known as TEP and then left together later that night to return to Browning Hall.[9] As they proceeded back to the dormitory, they were accompanied by at least three other people, including Brad Thibodeau. Chris Mueller testified that, at some point, he and Mr. Candido stopped by some woods to relieve themselves, at which time the rest of the group went on ahead across a sloped, grassy area (cutting behind the campus police station to Baird Hill Road). Chris Mueller and plaintiff then began "jogging" down the hill, attempting to catch up with the others. At this point, Chris Mueller was jogging and was some distance ahead of plaintiff.

At the bottom of the hill, Chris Mueller (according to his testimony) came onto some "macadam," which continued to slope downwards and then leveled off onto the street. He continued over the macadam and then proceeded to cross Baird Hill Road diagonally in order to take the "shortest line to the dorm." As he jogged across the street, Chris Mueller heard plaintiff scream, and he looked back and saw him on the ground in the street.

Brad Thibodeau testified that, on the night of plaintiff's fall, he and a group of

---

6. Mr. Candido's own testimony varied regarding this aspect of the events on the night of his accident. On direct examination he testified that he received an invitation to go to the Tau Epsilon Phi (TEP) fraternity house and then met his friends on his way to that fraternity.

7. When plaintiff was cross-examined at trial, he conceded that he told both the attending physicians at South County Hospital (where he was first treated) and later his own physical therapist that he had been running when he fell.

8. Chris Mueller's deposition was taken on March 27, 2001, and his testimony at the trial was offered by way of his deposition. Brad Thibodeau's deposition was taken on March 30, 2001, and his testimony at trial was also offered by way of his deposition.

9. The plaintiff denied that he visited a fraternity that night, and he also denied that he had ever visited the building that houses the TEP fraternity.

people (including plaintiff) had eaten dinner together in Butterfield Dining Hall and planned to "check out some of the things that [the] frats were having going on."[10]   Later that night, Brad Thibodeau met up with plaintiff and a group of people (including Chris Mueller) and "sampled" a few fraternities, one of which was TEP.[11] Brad Thibodeau testified that he arrived at TEP with plaintiff around 10 p.m.   He thereafter left TEP at some later time with plaintiff, Chris Mueller, and a small group of other persons in order to go to plaintiff's dormitory room for some cigars.[12]

According to the testimony of Brad Thibodeau, the group traveled along Campus Avenue and then left the road at some point near the police station and walked across an unpaved area towards Baird Hill Road.   He testified that plaintiff and Chris Mueller stopped by some trees to relieve themselves and that plaintiff fell on Baird Hill Road as he was catching up with the rest of the group.   Like Chris Mueller, Brad Thibodeau did not actually see plaintiff fall because he was ahead of him at the time.

The trial justice said that, even if he had found plaintiff to be credible as to the exact location of the fall (which he did not), there was no evidence presented at trial that the specific route which plaintiff chose to use was used as a walkway, such that defendants would be on notice as to its existence.

The plaintiff testified that he followed a "beaten path" across a grassy area to catch up with his friends after he and Chris Mueller had stopped to relieve themselves.   By contrast, however, Chris Mueller testified that no "beaten path" existed. Moreover, concerning their route, Brad Thibodeau testified: "It's not really a sidewalk or a lawn.   It's kind of like dirt, stone, a little bit of grass here and there." Brad Thibodeau further described the location of the fall as follows:

> "It was between the bottom of the hill and the police station, the slanted part of that.   It was all cracked and concaved from that part of the hill.   * * * Like there wasn't a sidewalk, and it was slanted.   It was pretty well slanted and the pavement was cracked coming down."

Although there was testimony that students at URI often walk where they please, the testimony of Tom Dougan (Vice President for Student Affairs), Francis McGovern (former Director of Safety and Risk Management), and David Bascom (Assistant Director for Landscape and Grounds) further established that the alleged area of the fall itself was not a walkway.   Mr. Dougan testified: "It's not a path.   It's not a road.   It's um—I don't know what you would call it.   It's a curb or a—to hold the earth back.   * * * [E]ssentially [it's] an embankment on the side of the road which is neither a path nor a walkway."   Mr. McGovern testified as follows: "That was part of the edge of the roadway on the embankment that holds

---

**10.**   Brad Thibodeau testified as follows about what the fraternities were seeking to achieve: "[The fraternities] were having their—they were trying to get people into their frats, trying to get the freshman initiated, trying to draw as many people as they could, so they were throwing all their parties."

**11.**   Brad Thibodeau testified that by his use of the word "sample" he was describing the

following activities: "Went to see what was going on.   If we didn't like one or if it was too crowded, we'd go to another one.   See the people, get to know—see if we liked any of the frats."

**12.**   The plaintiff denied any recollection that the group was crossing the campus in search of cigars.

back the grass that is in that location. That is not a walkway." Finally, Mr. Bascom testified that the area in question was a "paved embankment" and that no sidewalk existed in that area. He also testified that there was a sidewalk on the opposite side of Baird Hill Road.

Based on his independent assessment of this evidence, the trial justice found that Mr. Candido chose to pursue his own unlighted route across the grass while running to catch up with his friends. He further found that it was while he was proceeding along this route of his own choosing that plaintiff came across the area of crumbled asphalt. Therefore, it was the route that plaintiff chose, not any defect in an existing pathway or walkway, that contributed to plaintiff's fall.

After having carefully reviewed the record, we conclude that, in making these findings, the trial justice did not overlook or misconceive any material or relevant evidence and was not otherwise clearly wrong. *See Morrocco*, 713 A.2d at 253; *see also English*, 787 A.2d at 1149; *Graff*, 748 A.2d at 255. Therefore, the trial justice did not err in denying plaintiff's motion for a new trial. *See Graff*, 748 A.2d at 255.

To illustrate his conclusions, the trial justice referred to this Court's decision in the case of *Maslen v. Cicchelli*, 621 A.2d 183 (R.I.1993), as an example of a similar factual scenario in which a plaintiff chose not to walk on an established walkway. In *Maslen*, this Court denied the plaintiff's appeal from a judgment granting the defendant's motion for a directed verdict because we were of the opinion that the plaintiff deliberately chose a route adjacent to an apartment building that was unlighted and unmarked as a pathway. *Id.* at 183. The trial justice's only reference to *Maslen* in this case was in making the following observation:

"[T]he evidence is clear that [plaintiff] chose this path or this route which was not a walkway on his own, similar to the situation in *Maslen* where the plaintiff in that case chose not to walk on the walkways."

██ The plaintiff contends that an examination of the briefs submitted to this Court by the parties in the *Maslen* case would reveal that "the facts in *Maslen* were so disparate from the facts of this case as to render it completely inapplicable." We are aware of no authority which requires a trial justice to consult appellate briefs in decided cases in order to gain a more detailed understanding of the facts summarized in an opinion issued by this Court. We note that the sole case relied upon by plaintiff in support of that contention is *Allen v. Simmons*, 533 A.2d 541, 542–43 (R.I.1987), in which this Court examined the briefs filed in an earlier case to compare the arguments raised in that case with the arguments in the more recent case—not to examine in detail the underlying facts of the earlier case.

Here, the trial justice made a well-supported finding that the area of the fall was not an existing pathway and that the plaintiff could have used existing pathways in lieu of his chosen route. The trial justice's comparison of these facts with the factual situation in *Maslen* does not constitute error.

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record may be returned to the Superior Court.