**Leo CONNOR et al.**

v.

**Mary SCHLEMMER et al.**

**In re Estate of Kathleen T. Connor.**

**Nos. 2008–168–Appeal, 2008–183–Appeal.**

Supreme Court of Rhode Island.

June 7, 2010.

Samuel D. Zurier, Esq., Providence, for Leo Connor and Eugene Connor.

Lauren E. Jones, Esq., Providence, for Mary Schlemmer and Virginia Schlemmer Lavoie.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

This consolidated appeal involves two cases concerning the estate of the late Kathleen T. Connor (Kathleen). The first case is a declaratory-judgment action in which the plaintiffs, Leo Connor and Eugene Connor (the Connors or plaintiffs), (1) challenged a deed (2001 deed) executed by Kathleen,[1] their sister and aunt, respectively, and a power of attorney she executed in 2002 in favor of Virginia Schlemmer–Lavoie (Virginia); and (2) requested the imposition of a constructive trust on Kathleen's former home. The Connors appeal from a judgment in favor of the defen-

dants, Mary Schlemmer (Mary) and her daughter, Virginia, dismissing the plaintiffs' action on the merits.

The second case is an appeal by the Connors from an order of the Probate Court for the Town of Smithfield admitting to probate a will executed by Kathleen in 2002. A jury returned a verdict finding that Kathleen lacked sufficient mind and memory necessary to execute the will. Judgment was then entered in favor of the Connors, declaring the 2002 will null and void and remanding the matter to the Probate Court for further proceedings. Shortly thereafter, however, the trial justice granted the motion of the Estate of Kathleen Connor (the estate) for a new trial in an order entered on December 18, 2007.

The Connors timely filed notices of appeal in both cases. The cases were consolidated for the purposes of this appeal. For the reasons discussed in this opinion, we affirm both the judgment and the order of the Superior Court.

## I

### Facts[2] and Procedural History

#### A

#### Background

Kathleen T. Connor was born in January 1909, one of four children. In 1913, Kathleen's family moved to a farm on Mann School Road in Smithfield, where she would reside almost continuously until her death in 2006. Kathleen's cousin, Mary Donahue (later Schlemmer), also resided on the family farm and regarded Kathleen as "[her] big sister." Kathleen

---

1. We refer to the people involved in this case by their first names for the sake of clarity because many share the same surname. We intend no disrespect.

2. The facts narrated in the following pages were adduced from the testimony of the multiple witnesses who testified at trial.

remained close to Mary throughout her life.[3] She also enjoyed close relationships with Mary's children, especially her daughter Virginia. At trial, Virginia testified that she loved Kathleen "like a mother." According to Mary, Kathleen often referred to Virginia as "the daughter I never had."

Around 1960, Kathleen's two brothers, John, Jr. (Jack) and Leo, moved to New Hampshire and Vermont, respectively. By 1977, Kathleen was the sole occupant of the Smithfield farmhouse. In 1988, a developer bought the land surrounding the farmhouse, but Kathleen's nephews and brother Leo secured a deed for a rental property adjacent to the farmhouse and two-and-one-half acres of land for Kathleen. Although the brothers and their families lived in another state, they tried to visit Kathleen in Rhode Island regularly, and they celebrated holidays and family occasions with her. For many years, Kathleen also wintered with Jack and his family in Florida.

In 1976, Kathleen executed a will leaving the farmhouse to her brothers, Jack and Leo, and her residuary estate to her sisters-in-law, with various other specific bequests going to her extended family. Her nephew, Eugene Connor, testified that he specifically recalled one occasion on which Kathleen stated that she did not include Mary in her estate plan because she was "not a blood relative."[4] In 1985, Kathleen executed a second will that largely retained the same estate plan as the 1976 will. She requested a copy of her 1985 will

from the drafting attorney's office in 1991, but apparently did not make any changes to her estate plan at that time.

By the late 1990s, Kathleen had begun exhibiting some signs of mental deterioration and confusion. At trial, Kathleen's nephew Leo Connor, Jr. (Jerry), testified that around that time he "noticed * * * that she was always asking [him] the same questions and she would get [her brother Leo] mixed up with [her brother Jack] and things of that nature." One of Kathleen's nieces, Caroline Connor Martone, testified that, in April 2001, she and her family visited Kathleen unannounced and that Kathleen would not let them into her house and seemed "unlike" herself.[5] In May 2001, Kathleen was operating an automobile and accidentally struck a telephone pole in Smithfield, causing significant damage.

Mary and her children, who took Kathleen to most of her medical appointments, informed Kathleen's primary-care physician, Stephen A. Fanning, III, D.O., that she was becoming "increasingly forgetful." According to a medical report prepared by Dr. Fanning on July 19, 2001, his "initial impression" of his patient was that she was suffering from dementia. He recommended that she "should not drive [her] car" and suggested a living will and a power of attorney.

Soon thereafter, Mary's financial advisor prepared a power of attorney for Kathleen to sign. When Kathleen appeared reluctant to execute the power of attorney, her

---

3.  Elaine Ford, a relative of the Connors by marriage who attended the same church as Kathleen and who was called as a witness at trial by the Connors, referred to Mary as Kathleen's "sister."

4.  Kathleen's nephew, Leo Connor, Jr., also testified that Kathleen mentioned "on a regular basis" that Mary Schlemmer "wasn't a blood relative, meaning that she wasn't a

brother or sister." Another nephew, Michael Connor, testified similarly.

5.  At trial, Mary explained that Kathleen, who was ninety-two at the time of the incident, stated that she was startled by the unexpected visit and "didn't feel up" to hosting Caroline's eight children in her home.

brother Leo and his son Michael came to Rhode Island at Mary's request [6] and persuaded her to do so on August 1, 2001. According to Michael, his father "thought Kathleen's care would best be given to Mary Schlemmer[,] and so he had no reservation about giving her the power of attorney." Virginia's name was added to the power of attorney form shortly thereafter.[7] At trial, Michael and Mary agreed that Kathleen seemed competent to sign the power-of-attorney form.

On August 17, 2001, Mary's daughter, Alice Schlemmer, told Dr. Fanning that Kathleen was not eating, displayed increased memory loss, refused to let visitors enter her home, and was reluctant to visit her doctor. Doctor Fanning recommended placing Kathleen in an assisted-living facility, fearing that otherwise she "may wind up in [the] hospital." In September of that same year, Mary took Kathleen to see Jon Stoukides, M.D., director of geriatrics at Roger Williams Hospital, who made a "presumptive diagnosis" of Alzheimer's disease following some "cursory mental status testing to assess * * * memory and cognitive function * * *." At trial, Dr. Stoukides had "absolutely no recollection of" having treated Kathleen. Upon reviewing his office notes, however, Dr. Stoukides testified that Kathleen "scored 19 out of 30" on the Folstein Mini–Mental State Exam. This score indicated that Kathleen was operating at a "medium level" indicating "some degree of [mental] impairment * * *." In his opinion, "her judgment seemed fair in spite of her illness * * * and * * * her mood and affect seemed appropriate." After a second appointment on October 23, 2001, Dr. Stoukides reaffirmed his impression that Kathleen was experiencing "memory loss consistent with Alzheimer's * * *."

In September 2001, Mary met with Kathleen Biddle, a registered nurse at the Dora C. Howard Centre (Centre). According to Ms. Biddle's trial testimony, Kathleen spent one day (approximately four hours) at the Centre in October 2001. During that time, Ms. Biddle prepared various application materials and intake surveys with information supplied by Mary. According to these documents and Ms. Biddle's testimony, Mary described Kathleen's short-term memory loss as "severe" and her long-term memory loss as mild to moderate. Mary also informed her that Kathleen was not able to make financial and healthcare decisions independently. Ms. Biddle testified on cross-examination, however, that Kathleen was able to make decisions about personal relationships; she knew her family members and could relate to them. Ms. Biddle found Kathleen "very sociable," articulate, and appropriately behaved while at the Centre.

In November 2001, Kathleen moved into North Bay Manor, an assisted-living facility in Smithfield. Mary visited her there "almost every day" and often took her out for church, errands, and family holidays. According to Mary, her five daughters visited with Kathleen on a daily basis, espe-

6. According to Michael Connor, at that time (summer 2001), Mary informed him and his father that Kathleen "was losing the rent money that was paid to her[,] * * * [and] would be delinquent on telephone or power bills * * *." At trial, Mary confirmed that she told Leo and Michael that Kathleen was "becoming forgetful" and at times forgot to mail in payment of her bills.

7. According to Virginia's trial testimony, she was not informed that she had power of attorney for Kathleen until sometime after it was executed. She also stated that, at that time, she did not believe that her name actually had been added. An additional power of attorney was executed in February 2002, naming only Virginia. Virginia never exercised the power of attorney.

cially Virginia, whom Kathleen dubbed "Ginny on-the-spot." Virginia often took Kathleen to "spend the day" at the farmhouse during this period. At trial, Raymond Maxwell, the executive director of North Bay Manor, testified that Kathleen appeared to be of sound mind when she moved into the assisted-living facility and that she remained in that condition for "quite a bit of time." Mr. Maxwell also stated that Mary, Virginia, and other members of the Schlemmer family were regular visitors, although he saw Kathleen's Connor relatives visiting on only one occasion. Rose Marie Paul, a licensed practical nurse at North Bay Manor during Kathleen's residence there, testified similarly to Mr. Maxwell. Additionally, Ms. Paul testified that Kathleen's low score on a March 2002 Folstein Mini–Mental State Exam probably was due to the fact that Kathleen was suffering from a urinary-tract infection at the time because "knowing her, there had to have been something going on [to explain the low score]."

According to Mary, Kathleen "had told [her] over the years that she had intentions * * * [of putting Virginia's] name on [the deed of] her house because [Virginia] had always been so good to her." At trial, Virginia testified that Kathleen had mentioned a similar plan to her over the course of several years and expressed a definite intention to add Virginia's name to the deed shortly after moving into North Bay Manor.[8]

In December 2001, Kathleen conveyed the family residence to herself and Virginia as joint tenants by way of a quitclaim deed. Kathleen's attorney, Frank Mastrati, Jr., was referred to her by the Schlem-

mers' financial advisor upon inquiry by Virginia. Virginia paid some or all of Mr. Mastrati's fee.

Attorney Mastrati concentrates his practice in elder law. He initially met with Kathleen at North Bay Manor in November or early December 2001, and Virginia joined them for the introductions. Attorney Mastrati then spoke with Kathleen privately for approximately one hour. After some "general conversation" (in which Kathleen impressed him as a "very lovely lady"), Kathleen informed him that "she wanted a deed done and she wanted to place Virginia Schlemmer's name on the deed with her." At trial, attorney Mastrati recalled that Kathleen "talked about Ginny with * * * a fondness of a mother talking about a daughter." He also recounted how he "went over the pros and cons of the deed and * * * explained to her the disadvantages of adding Virginia's name to the deed * * *." He testified that he was convinced that Kathleen understood the various potential disadvantages he described and was of sound mind to execute the deed at the time.

Attorney Mastrati prepared the deed and then returned to North Bay Manor in December 2001 for a second, also private, meeting with Kathleen. At that second meeting, he testified, he "reiterated all the positive[s] and negatives of placing Virginia on the deed so [Kathleen] fully understood what she [was doing]." He reaffirmed at trial that he believed she understood him and was of sound mind at that time. At a third meeting, also in December 2001, the deed conveying the property to Kathleen and Virginia was executed. Neither Virginia nor Kathleen ever mentioned the

---

8. On the contrary, in their brief, plaintiffs contend that Virginia "resolved to take action" to prevent Kathleen's house from being sold to pay for her living expenses. Thus, they suggest that Virginia was the impetus and the driving force behind the execution of the new deed.

new deed to their family members, including Mary.

Attorney Mastrati also was retained to draft a new will for Kathleen. Attorney Mastrati testified that, when meeting with Kathleen to discuss the particulars of the will, he asked her whether she already had a will, and she replied that she did not. Kathleen provided him with some notes concerning her wishes, and he also took notes during their discussion of the will. During the meeting, Mr. Mastrati recalled, she mentioned that although she had no children, she did have some family in Vermont or New Hampshire. She also referred to Mary as her sister (not her cousin).

According to attorney Mastrati, Kathleen expressed a desire to leave her house to Virginia in her will. At trial, Mr. Mastrati stated that he explained that such a gift would be redundant, since she already had deeded the property in joint tenancy to Virginia. Although he believed that Kathleen understood this, like many of his elderly clients, she wanted to include the gift in her will even though she already had executed the deed.

Kathleen executed her new will on February 25, 2002, after reviewing it for ten to fifteen minutes and correcting some spelling errors.[9] Attorney Mastrati signed as a witness, and he testified at trial that he was satisfied that Kathleen was of sound mind and competent to make a will on the basis of his several meetings and discussions with her. Thereafter, Kathleen also executed general and healthcare powers of attorney naming Virginia.

On March 5, 2002, Mary Lou DuClos, a social worker at North Bay Manor, administered a Folstein Mini–Mental State Exam to Kathleen. Kathleen scored ten out of thirty possible points on the exam, indicating "comprehensive deficits."

According to trial testimony, the plaintiffs eventually learned of the 2001 deed during the summer of 2004. Eugene, Leo, and Michael were in Rhode Island to visit Kathleen and stopped by the farmhouse to see how it was being maintained. They discovered that "a lot of work had been done * * * inside the house and that the attic had been cleaned out * * *." They also discovered that "the barn had been demolished, and [they] began to wonder what was going on * * * and who was paying for all of the work * * *." Suspicions aroused, the Connors visited the Smithfield registry of deeds, where they learned that the property was now jointly held by both Kathleen and Virginia.

In early 2005, plaintiffs filed a petition in the Smithfield Probate Court seeking the appointment of a guardian *ad litem* to manage Kathleen's finances. The Probate Court appointed Paula Cuculo, a North Providence probate judge, as a guardian *ad litem* for Kathleen. In February 2005, Ms. Cuculo met with Kathleen at North Bay Manor. Mr. Mastrati was present at this meeting, but did not speak or participate in the discussion, per Ms. Cuculo's request. According to Ms. Cuculo's trial testimony, Kathleen was familiar with the estate plan that attorney Mastrati prepared in 2001. Kathleen also knew that she had given powers of attorney to Mary and Virginia. Ms. Cuculo testified that she was "impressed" that, at the age of ninety-six, Kathleen was "as cognizant and articulate as she was," and Ms. Cuculo noted that "you could tell she took good care of herself." In sum, she found Kathleen to be "forgetful but * * * cognizant.

9. The will referred to Kathleen as "Kathleen J. Connor" instead of "Kathleen T. Connor." She made no correction to her name in the body of the will, but signed as "Kathleen T. Connor."

She was aware, she was easy to talk to. She * * * knew whatever you asked her, she could answer a question." Ms. Cuculo conceded that Kathleen was unable to remember where her brother Leo lived, could not recall that her brother Jack was deceased, and displayed other signs of confusion.

Ms. Cuculo also spoke with Michael, Eugene, Mary, Virginia, Dr. Fanning, and attorney Mastrati. In her report, she concluded that the previously executed powers of attorney constituted a "less restrictive relationship" than the requested guardianship, that Kathleen's personal and financial needs were being met by the donees of the powers of attorney, and that nothing Ms. Cuculo uncovered during the course of her investigation indicated that "[the power-of-attorney] documents had been improperly prepared or that [Kathleen] didn't have the capacity to * * * prepare and execute them." She therefore advised that a guardianship was not necessary in Kathleen's case.

In December 2005, the Connors brought this action for declaratory judgment seeking to invalidate the deed on grounds of lack of capacity and/or undue influence and requesting a constructive trust.

Unfortunately, Kathleen fell in the dining area at North Bay Manor in January 2006, suffering fractures in her hip and leg. She underwent surgery and remained hospitalized for several days. Upon discharge, Kathleen returned to North Bay Manor for a couple of months.

According to Virginia, she had promised Kathleen that when the time came she would help to fulfill Kathleen's wish to die in her own home. In March, Kathleen was removed from North Bay Manor and moved to the home of one of Mary's daughters, where she received end-of-life care. She died in June 2006.

## B

### Trial

A seven-day trial on the consolidated cases was held before a jury, between October 30 and November 7, 2007. The jury served as the trier of fact in the Probate Court appeal, but only rendered an advisory verdict in the declaratory-judgment action because that case implicated the Superior Court's equity jurisdiction.

The Connors presented eight witnesses, several of whom were Kathleen's family members or close relations, including Caroline Connor Martone, Leo Connor, Jr., Michael Connor, and Elaine Ford. The Connors also presented the testimony of several medical professionals who evaluated Kathleen—Ms. DuClos, Dr. Stoukides, and Ms. Biddle. The defendants presented fourteen witnesses: Mary Schlemmer; her daughters Virginia, Ann Marie Leach, and Theresa Garlacy; Kathleen's friends Patricia Jaswell and Sonya Muscatelli;[10] Raymond Maxwell; Rose Marie Paul; Dr. Fanning; attorney Mastrati; attorney Cuculo; and attorney Robert D. Murray (through whom defendants presented records of Kathleen's 1985 will). The defendants also presented the testimony of Mary Elizabeth Ouellette (a florist),[11] and Eugene to impeach his testimony. Additionally, defendants presented several video clips showing Kathleen on her birthday in 1999, and on other occasions in October

---

10. Both friends testified to the effect that Kathleen was of sound mind during the period when the will and deed were drafted and executed.

11. Ms. Ouellette's testimony was presented to impeach Eugene's assertion that he and his family were not informed that Kathleen had been moved to Ann's house before her death.

2001, December 2001, December 2002, and January 2005.

The jury returned a verdict in favor of the Connors in both cases, finding that Kathleen lacked sufficient mind and memory to execute both the will and the deed. The jury's decision that Kathleen did not possess sufficient mind and memory necessary to execute a deed, however, was strictly advisory.[12] Addressing himself to the question of the deed, the trial justice strongly disagreed with the jury's advisory finding, stating that those findings "shock[ed] the conscience of the Court * * *." The trial justice observed that the case had "amazing analogies" to *Pollard v. Hastings*, 862 A.2d 770 (R.I.2004), which affirmed a decision granting a new trial after the jury found the testator was not competent. Ultimately, the trial justice did not believe the Connors had presented clear and convincing evidence that Kathleen did not have capacity to execute the deed.

Specifically, the trial justice found Dr. Fanning "extremely persuasive" when he testified that Kathleen was "pleasantly confused" but had the "testamentary capacity" to understand her own affairs. In contrast, he noted that Dr. Stoukides could not "remember[ ] even interacting" with Kathleen and that the Folstein Mini–Mental State Exams relied on by the Connors were merely "screening tests, not diagnostic" ones, and in addition there was evidence that Kathleen's low scores could have been influenced by other factors.

The trial justice was also impressed with Ms. Cuculo—a witness who was well known to the court as "a woman of extremely high integrity"—and credited her testimony concerning Kathleen's mental capacity. He provided an overview of the

testimony of the other trial witnesses, concluding that the weight of the credible evidence supported the proponents of the deed. After commenting on trial testimony and discussing the jury's conclusion, the trial justice noted that the video clips that the proponents of the deed presented were "[t]he most telling evidence" that Kathleen was "an articulate, intelligent, well put-together woman," and served to powerfully "bolster" the witness' testimony.

Ultimately, the trial justice found that, although Kathleen probably missed her family from out of state, she did not feel abandoned by them and was well aware that Ms. Schlemmer was not her biological sibling. The evidence demonstrated, he found, that Mary and Virginia were "the constant in [Kathleen's] life for some 15 or 16 years[.]" Although he believed that Mary and Virginia naturally exerted "influence" over Kathleen, he did not find such influence to be "undue." Rather, he found that it was "an influence gained by love, compassion, meeting the needs of a woman getting older, [and] taking her into the bosom of their family." In his opinion, the jury did not follow his instructions or "fully apprehend[ ] the burden of clear and convincing evidence * * *." Judgment was entered in favor of the proponents of the deed in the declaratory-judgment action, and in favor of the challengers of Kathleen's 2002 will in the Probate Court appeal (consistent with the jury's verdict).

**C**

**Motion for Reconsideration and Motions for New Trial**

The Connors filed a motion for reconsideration in the declaratory-judgment action

12. By mutual consent of counsel, the jurors were not informed that their findings in the declaratory-judgment action would only be "take[n] under advisement" by the trial justice.

on November 14, 2007. A hearing on the motion was held before the trial justice on November 19, 2007. At the conclusion of argument, the trial justice denied the motion from the bench. He noted that plaintiffs raised "for the first time * * * an allegation of fraud and deceit perpetrated by Virginia * * * and Mary * * * and Mr. Mastrati acting in concert which this Court completely discounts and gives absolutely no credence to." He stated that he "did not think [a] constructive trust had been established just because there is a relation of confidence and trust * * *." He specifically found "no undue influence in [the] case."

The trial justice also discussed Mr. Mastrati's testimony at some length. He noted that, although Mr. Mastrati did seem somewhat unclear about the precise legal definition of "the natural objects of one's bounty," the trial justice could find "nothing wrong with the manner in which he conducted the will proceedings." Indeed, he opined that "a workaday lawyer" would not normally ask elderly clients "who the natural objects of their bounty are, and if they appear to be competent on their face, [such lawyers] don't ask about the family history." While he conceded that Mr. Mastrati "[c]ould [possibly] have done a better job in interrogating [Kathleen]," he had ample opportunity, over the course of several meetings, to evaluate Kathleen's competence.

He also specifically discussed the Connors' arguments with respect to certain congruencies between Kathleen's allegedly-undisclosed 1985 will and the 2002 will. Ultimately, he concluded that the similarities prove the "absence of fraud * * *."

The trial justice also explained that, in rendering his decision in the declaratory-judgment action, he "didn't rely on the video [from] 2005 or 2006 [recorded] just months before [Kathleen's] death." Rather,

he mentioned the videos "parenthetically and indicated that [they] did not weigh on [his] decision * * *." In conclusion, the trial justice found that plaintiffs had failed to carry their burden of proof, while defendants demonstrated by clear and convincing evidence that Kathleen was of sound mind at the time she executed the deed, was not the subject of undue influence, and was not defrauded or deceived.

On December 7, 2007, the estate moved for a new trial in the Probate Court appeal. The Connors moved for a new trial in the declaratory-judgment action on December 10, 2007. The trial justice heard argument on both motions on December 18, 2007. He granted defendants' motion in the Probate Court appeal and denied plaintiffs' motion in the declaratory-judgment action that same day. Thereafter, the Connors timely appealed to this Court.

## D

### Arguments on Appeal

The Connors raise several issues on appeal. First, they argue that the trial justice did not apply the correct legal standard to their constructive trust claim. This misunderstanding of the law was compounded, they suggest, by the trial justice's misapprehension and misapplication of material facts. The Connors further argue that the trial justice inadequately analyzed attorney Mastrati's testimony and afforded too much weight to Ms. Cuculo's testimony. They also contend that the trial justice made several erroneous evidentiary rulings and erred in not allowing them to present rebuttal testimony concerning the 2004 funeral of Kathleen's brother, Jack. Finally, the Connors argue that the trial justice incorrectly decided their motion for a new trial in the declaratory-judgment action

and defendants' motion for a new trial in the Probate Court appeal.

For their part, defendants respond that the trial justice made no errors in admitting or excluding evidence and that plaintiffs misstate the evidence upon which the trial justice relied. Moreover, they contend that the trial justice undertook the correct legal analysis in the declaratory-judgment action and correctly ruled on both motions for new trial.

## II

## Analysis

## A

## Constructive Trust

### 1. Standard of Review

■ Rule 52(a) of the Superior Court Rules of Civil Procedure requires a trial justice in a nonjury or advisory jury case "to make specific findings of fact upon which he [or she] bases his [or her] decision." *Nardone v. Ritacco*, 936 A.2d 200, 206 (R.I.2007) (quoting *White v. LeClerc*, 468 A.2d 289, 290 (R.I.1983)). Rule 52(a) further requires a trial justice to "find the facts specially and state separately its conclusions of law thereon * * *." "It is important to note that '[t]he trial justice need not engage in extensive analysis to comply with this requirement.'" *Nardone*, 936 A.2d at 206 (quoting *White*, 468 A.2d at 290). If these requirements are not satisfied, this Court may reverse or remand the case "unless the record will yield a full understanding and resolution of the controlling and essential factual and legal issues." *Id.* (quoting *Town of Charlestown v. Beattie*, 422 A.2d 1250, 1251 (R.I.1980)).

### 2. Alleged Failure to Address Constructive–Trust Claim

■ The Connors contend that the trial justice failed to address their theory of constructive trust in the declaratory-judgment action. This Court previously has held that "[t]he underlying principle of a constructive trust is the equitable prevention of unjust enrichment of one party at the expense of another in situations in which legal title to property was obtained by fraud or in violation of a fiduciary or confidential relationship." *Dellagrotta v. Dellagrotta*, 873 A.2d 101, 111 (R.I.2005) (quoting *Renaud v. Ewart*, 712 A.2d 884, 885 (R.I.1998) (mem.)). To demonstrate that the imposition of a constructive trust is appropriate, "a plaintiff is required to show by clear and convincing evidence (1) that a fiduciary duty existed between the parties and (2) that either a breach of a promise or an act involving fraud occurred as a result of that relationship." *Manchester v. Pereira*, 926 A.2d 1005, 1013 (R.I.2007).

The trial justice summarized the law of constructive trusts and the allocation of the burden of proof as he understood it in his instructions to the advisory jury. The trial justice's jury instruction on the issue of constructive trust reads, in pertinent part, as follows:

> "One who seeks to prove that a constructive trust has been established between Kathleen Connor and Mary Schlemmer and Virginia Schlemmer–Lavoie must establish with respect to real property, that is the farmhouse that is transferred, that there must be some element of fraudulent conduct by Mary Schlemmer and by Virginia Schlemmer–Lavoie in their procuring of the conveyance of the property from Kathleen Connor to Kathleen Connor and Ms. Lavoie in order for a constructive trust to arise.
>
> " * * *
>
> "If you believe that the opponents of the deed have proved that Mary Schlemmer and Virginia Schlemmer–Lavoie perpetrated fraud or breached a fiducia-

ry or confidential duty to Kathleen Connor and have proved [that] to you by clear and convincing evidence * * * then you must find that a constructive trust has been established between these parties.

"If you find that the opponents had failed to prove that Mary Schlemmer and Virginia Schlemmer–Lavoie perpetrated fraud or breach of fiduciary or confidential duty to you by clear and convincing evidence, then no constructive trust has been established."

Turning to the first element for the imposition of a constructive trust, there was no dispute at trial that Kathleen and Mary and Kathleen and Virginia shared close, loving, and confidential relationships. Moreover, it was undisputed that Mary and Virginia owed fiduciary duties to Kathleen after she executed powers of attorney in their favor. Thus, the threshold question of material fact on the constructive-trust issue was whether Mary or Virginia perpetrated fraud or breached a fiduciary or confidential duty to Kathleen.

■ In his decision on the motion for reconsideration, the trial justice thoroughly reviewed the evidence and said he "was astounded by [the] jury verdict." There was no equivocation in the ruling of the trial justice, who commented that the verdict of the advisory jury shocked the conscience of the court. The Connors argue, however, that the trial justice committed reversible error by failing to apply the correct legal standard for constructive trusts. They assert that once the opponents of a gift establish a gratuitous transfer to a person in a relationship of confidence and trust, the burden of proof shifts to the donee to demonstrate the existence of adequate capacity on the part of the donor, the absence of any undue influence, and the consequences of the gift.

Even assuming without deciding that the Connors have articulated the correct legal standard, their argument is dispelled by a careful review of the trial justice's decision. In his decision setting aside the jury verdict, he found Dr. Fanning to be an "extremely persuasive" witness who expressed a professional opinion that Kathleen had "testamentary capacity to understand and deal with her own affairs." He commented on the testimony of Kathleen's friends, all of whom reported that "she was intelligent, she was engaging, [and] she knew exactly what she was doing." The trial justice also noted the testimony of the executive director of North Bay Manor, the attorney who prepared her will in 1985, a nurse, and defendants. He concluded his decision by stating that "[t]he standard of proof of clear and convincing evidence has not been reached by the opponents and clearly has been met in this case by the proponents with regard to the deed." Moreover, in denying the Connors' motion for reconsideration, the trial justice summarized:

"this Court finds that the proponents of this deed have proven by clear and convincing evidence that Kathleen Connor at the time she entered that deed knew exactly what she was doing, knew who the objects of her bounty were, was not under the undue influence of anybody, that this was not a constructive trust formed by these people in the meaning of that legal phraseology and that there was absolutely no scintilla of evidence of fraud or deceit perpetrated upon Kathleen Connor by either Mr. Mastrati in conjunction or in league with [Mary] Schlemmer or Virginia Schlemmer–Lavoie and had that been pled and argued, the result would have been the same."

Upon review of the trial justice's decision in the declaratory-judgment action and on the motion for reconsideration, we are satisfied that the trial justice ade-

quately set forth the facts of the case and separately recited the conclusions of law drawn therefrom. Moreover, the record itself is more than sufficient to "yield a full understanding and resolution of the controlling and essential factual and legal issues." *Nardone*, 936 A.2d at 206 (quoting *Town of Charlestown*, 422 A.2d at 1251). The trial justice clearly found that defendants had neither committed fraud nor breached a fiduciary duty and that defendants had in fact proved Kathleen's competence and lack of undue influence by clear and convincing evidence. In light of this, we discern no basis for reversing the trial justice's decision in the declaratory-judgment action.

## B

### The Trial Justice's Analysis of the Evidence

The plaintiffs suggest that the trial justice overlooked and misconceived certain evidence presented at trial concerning Kathleen's competence to execute the 2001 deed. Specifically, they contend that the trial justice failed to discuss Mr. Mastrati's testimony in his bench decision and did not adequately consider the alleged shortcomings and inconsistencies in that witness's testimony. Conversely, plaintiffs contend that the trial justice assigned improper weight to the testimony of Paula Cuculo.

The Connors advance the argument that, when ruling in a case tried before an advisory jury, the trial justice should give significant deference to the jury's verdict. In support of this argument, they cite the following language from this Court's decision in *Filippi v. Filippi*, 818 A.2d 608, 630

(R.I.2003): "the advisory jury verdict should receive a great degree of deference in factual determination * * *."

█ Here, the only factual determination made by the advisory jury was that Kathleen had not "possessed sufficient mind and memory necessary to execute a deed to her real property." The trial justice rejected the advisory jury's determination, stating that it shocked the conscience of the court. He thereupon, consistent with Rule 52(a), made specific findings of fact upon which he based his conclusion that "the jury got it wrong." We have carefully reviewed the trial justice's findings as they relate to the issues before us on appeal, and we perceive no clear error with respect to any finding of material fact.

The trial justice did not specifically evaluate Mr. Mastrati's testimony in his decision in the declaratory-judgment action, but referred to him in passing during discussion of a separate issue.[13] The Connors thereafter filed a motion for reconsideration. The trial justice denied the motion, but offered a lengthy elaboration on his initial ruling, including a thorough discussion of the weight he afforded Mr. Mastrati's testimony. Most importantly, the trial justice found that attorney Mastrati's credible testimony supported a finding that Kathleen was competent at the time she executed the deed, that she "was not under the undue influence of anybody," and that there was no evidence of fraud or deceit perpetrated by Virginia, Mary, or Mr. Mastrati. We reject the argument that these findings were not amply supported by the material evidence offered at trial.[14]

---

13. The omission of an extended discussion of Mr. Mastrati's testimony in the trial justice's initial decision in the declaratory-judgment action may be explained, at least in part, by the fact that most of the Connors' arguments concerning his testimony (both at trial and on

appeal) bear primarily on the validity of the 2002 will.

14. This Court will not address plaintiffs' arguments concerning Mr. Mastrati's alleged unethical performance of legal services, incom-

The plaintiffs' arguments with regard to Ms. Cuculo's testimony are similarly unavailing. First, they suggest that "Ms. Cuculo's conclusion concerning Kathleen's competence was limited to the issue of Kathleen's execution of the power of attorney in 2001, and did not extend to [Kathleen's competence to execute] the Deed and the Will."

Kathleen executed powers of attorney in favor of Mary in August 2001 and in favor of Virginia shortly thereafter. She executed the new deed in December 2001. In his decision on plaintiffs' motion for reconsideration, the trial justice noted that it was Ms. Cuculo's "opinion that * * * [Kathleen] probably knew exactly what she was doing back in that [late 2001] time period * * *." Although it is clear that Ms. Cuculo could not (and did not) testify to Kathleen's competence at the time she executed the 2001 deed and the 2002 will, the trial justice was entitled to draw reasonable inferences from her testimony. The trial justice did not consider Ms. Cuculo's testimony as direct evidence of Kathleen's competency when she executed the new deed in December 2001, although he reasonably may have considered that Ms. Cuculo deemed Kathleen competent to execute the powers of attorney mere months earlier.

The Connors further argue that Ms. Cuculo's 2005 observations of Kathleen were inaccurate because "Kathleen successfully applied her intelligence and social skills to project a false appearance of competence at a time when Dr. Fanning[, using a decision-making-assessment tool,] had conclusively determined * * * that Kathleen had lost it." As discussed at greater length below, however, Dr. Fanning's assessment was not admitted as evidence at trial and, therefore, cannot be treated as

grounds for assailing Ms. Cuculo's testimony.

## C

### The Trial Justice's Evidentiary Rulings

#### 1. Standard of Review

■ "It is well established that 'the admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial [justice's] decision unless a clear abuse of that discretion is apparent.'" *Notarantonio v. Notarantonio*, 941 A.2d 138, 149 (R.I.2008) (quoting *DiPetrillo v. Dow Chemical Co.*, 729 A.2d 677, 690 (R.I.1999)).

#### 2. Alleged Failure to Admit Probative Evidence

■ During trial, the trial justice denied the admission into evidence of a "Decision-making Assessment Tool" prepared by Dr. Fanning on January 31, 2005, based on an examination of Kathleen performed on May 13, 2004. The trial justice noted that the "information provided by [Dr. Fanning] in '05 on [Kathleen's] ability to address financial matters [was] not relevant to her ability to do so in 2001 and 2002, which this physician has already stated that he felt she was capable of doing * * *." As a result, the trial justice barred admission of the 2005 document on grounds of relevance. We discern no abuse of discretion in the trial justice's ruling.

On November 2, 2007, plaintiffs' counsel questioned attorney Mastrati concerning any conversations he may have had with Kathleen about the effect of changes to her estate plan in 2001 and 2002. The trial justice sustained numerous objections to various questions during this portion of Mr. Mastrati's examination. On appeal,

petence, perjury, or fraud. We agree with the trial justice that these arguments were not

adequately advanced at trial and, moreover, are wholly without merit.

plaintiffs challenge the trial justice's exclusion of certain questions allegedly going to Kathleen's knowledge and understanding of the changes being made to her estate plan.[15] It is clear, however, that none of the trial justice's evidentiary rulings during this portion of the trial were an abuse of discretion.

Finally, plaintiffs allege that the trial justice erred in refusing to allow them to present a "rebuttal case" in response to a portion of Mary's trial testimony. At trial, Mary testified that she did not attend Jack's funeral or wake. According to their brief, plaintiffs attempted to present Eugene as a rebuttal witness "to testify that Mary told him, at Jack's wake, of Kathleen's determination to attend her brother's funeral, indicating that she would walk to New Hampshire if [Mary] did not drive her there." The trial justice did not allow such testimony on grounds that it was not "true rebuttal."

■ As this Court previously has explained, " 'the proper function and purpose of rebuttal testimony is to explain' or to discredit the evidence of an adverse party." *Ruffel v. Ruffel*, 900 A.2d 1178, 1190 (R.I.2006) (quoting *State v. Kholi*, 672 A.2d 429, 433 (R.I.1996)). The admission of evidence, including rebuttal evidence, is a matter confided to the sound discretion of the trial justice. *See Ruffel*, 900 A.2d at 1190. In the instant case, we discern no abuse of discretion.

### 3. Alleged Failure to Exclude Irrelevant and Inadmissible Evidence

■ The Connors also contend that the trial justice improperly allowed the introduction into evidence of a 2005 video clip of Kathleen interacting with family members.[16] They argue that the trial justice incorrectly relied on this evidence in rendering his decision.

In his decision, the trial justice referred to the video clips, including the 2005 clip, as the "most telling evidence" that Kathleen was competent at the time she signed the 2001 deed and 2002 will. He explicitly noted, however, that the videos were not direct evidence of her mental state in late 2001/early 2002, but rather served to persuasively "bolster" the testimony of the witnesses presented by the proponents of the deed and will. Indeed, at the time he allowed the introduction of the 2005 video, the trial justice reminded the jury that "the operative time that we're really concerned with is the time when the deed was executed and the will was executed in 2001, 2002. So because we've had other evidence from * * * late[r] dates through testimony and still pictures, I'm going to allow [the 2005 video] as well. But keep in mind that this is well after the time period in controversy." He reiterated this assertion more forcefully in his decision of the motion for reconsideration, wherein he stressed that he "didn't rely on the video [from] 2005 or 2006 * * *." He also indicated that the videos "did not weigh on [his] decision * * *." We have no reason to doubt the veracity of the trial justice's statements. Moreover, the trial justice enunciated more than adequate bases for his decision aside from the video evidence. Accordingly, we discern no abuse of discretion.

---

15. The Connors cite to the record, but we are unable to locate the offending question. The cited page concerns attorney Mastrati's understanding of inheritance laws, not Kathleen's state of mind.

16. The Connors refer to this clip as a "2006 video of Kathleen noting her appreciation of poetry from Wordsworth and Yeats." It appears from the record that this video actually dates from January 2005.

## D

## Motions for New Trial

### 1. Motion for New Trial in the Declaratory–Judgment Action

After judgment entered on the declaratory-judgment action, the Connors moved for a new trial under Rule 59(a) of the Superior Court Rules of Civil Procedure. In their supporting memorandum, they specifically quoted the following language from this Court's decision in *Corrado v. Providence Redevelopment Agency*, 110 R.I. 549, 554–55, 294 A.2d 387, 390 (1972), setting forth the purported standard for the court's decision on their motion:

> "the court in a nonjury civil action may review its own decision and grant a new trial only if it finds either a manifest error of law in the judgment previously entered or that there is newly discovered evidence not available at the original trial that is of sufficient importance to warrant a new trial."[17]

In their memorandum in support of their motion, the Connors set forth essentially the same arguments they previously advanced in their motion for reconsideration. The plaintiffs' motion was denied after summary argument at a hearing on December 18, 2007, and an order to that effect entered that day. Contrary to the Connors' contentions, we are satisfied that the trial justice did not commit a manifest error of law in his judgment by failing to apply the proper legal standard with re-

spect to plaintiffs' claims based on constructive trust and undue influence. Likewise, the Connors did not identify any newly discovered evidence that was not available at trial which was of sufficient importance to warrant a new trial.[18] We conclude, therefore, that the trial justice did not err in denying plaintiffs' motion for new trial in the declaratory-judgment action.

### 2. Motion for New Trial in Probate Court Appeal

The estate moved for a new trial in the Probate Court appeal on December 7, 2007. The trial justice heard argument on the motion and ruled in favor of the estate on December 18, 2007. The Connors challenge the trial justice's decision on the grounds that (1) the jury had ample evidence upon which to base its verdict that Kathleen lacked testamentary capacity to execute the 2002 will or, alternatively, (2) that there was evidence to support their theories of undue influence and/or constructive trust.

As this Court has often stated, "[w]hen ruling on a motion for a new trial [in a civil case tried to a jury], the trial justice acts as a 'superjuror' and 'should review the evidence and exercise his or her independent judgment in passing upon the weight of the evidence and the credibility of the witnesses.'" *Seddon v. Duke*, 884 A.2d 413, 413 (R.I.2005) (mem.) (quoting *Franco v. Latina*, 840 A.2d 1110, 1111 (R.I.2004)). The trial justice undertakes

---

17. The plaintiffs mistakenly attribute this quotation to this Court's decision in *Colvin v. Goldenberg*, 108 R.I. 198, 273 A.2d 663 (1971). We also note that this standard of review dates from before the major 1995 amendments to Rule 59 of the Superior Court Rules of Civil Procedure. In light of plaintiffs' argument, we need not consider whether the quoted standard reflects the standard of the current rule.

18. The Connors suggested that Dr. Fanning's 2005 report was "new evidence" sufficient to support the grant of a new trial in the declaratory judgment action. As we previously have discussed, however, that document was available at the time of trial and was properly excluded by the trial justice.

his or her "independent appraisal of the evidence in the light of his [or her] charge to the jury." *Kurczy v. St. Joseph Veterans Association, Inc.*, 713 A.2d 766, 770 (R.I.1998) (quoting *State v. Doctor*, 690 A.2d 321, 329 (R.I.1997)). The trial justice "may set aside a verdict 'when [his or her] judgment tells [him or her] that it is wrong because it fails to respond truly to the merits of the controversy and to administer substantial justice and is against the fair preponderance of the evidence.'" *Murray v. Bromley*, 945 A.2d 330, 333 (R.I.2008) (quoting *Candido v. University of Rhode Island*, 880 A.2d 853, 856 (R.I. 2005)). This Court will affirm a trial justice's decision on a motion for a new trial on appeal "as long as the trial justice conducts the appropriate analysis, does not overlook or misconceive material evidence, and is not otherwise clearly wrong." *Id.* (quoting *Morrocco v. Piccardi*, 674 A.2d 380, 382 (R.I.1996)). On appeal, the decision of the trial justice is "accorded great weight." *Botelho v. Caster's, Inc.*, 970 A.2d 541, 546 (R.I.2009).

Deciding the motion from the bench, the trial justice noted that "this Court firmly believes that the jury misconceived probative, relevant and reliable evidence regarding the testamentary capacity of [Kathleen] Connor." He proceeded to review the evidence he found most relevant at trial and discussed the credibility and significance of the testimony of numerous witnesses. He concluded that the verdict suggested that the jury "completely disregarded and discredited [the] evidence[,] which [the] Court cannot[,] in the interest of true justice[,] abide."

Moreover, the trial justice found no credible evidence of "undue influence" or "conspiracy by [Mary] or [Virginia] to take advantage of [Kathleen], [to] thereby come to her property through [il]licit means * * *." He concluded that "the verdict was against the law [as communicated to the jury] and certainly against the credible, reliable and probative evidence with regard to [Kathleen's] competency to make a will." The trial justice also stressed that granting a new trial was an extraordinary remedy and one that he did not undertake lightly.

This Court can find no error in the trial justice's decision to grant a new trial in the Probate Court appeal. He conducted a thorough and searching review of the evidence, undertook the proper legal analysis, and reached his decision only after much deliberation and circumspection.

## III

## Conclusion

Upon careful review of the record before us, we affirm both the judgment and order of the trial justice. The papers in the declaratory-judgment action shall be remanded to the Superior Court, and the papers in the Probate Court appeal are hereby remanded for a new trial consistent with the order of the Superior Court.

Justice INDEGLIA took no part in the consideration or decision of this appeal.